Davis, Judge,
delivered the opinion of the court:
Plaintiffs are the owners of six tracts[1] within one mile (or thereabout) from the ends of the single north-south runway at Altus Air Force Base, Jackson County, Oklahoma. The parcels are either wholly or partially within the fan-shaped approach zone directly under the established flight path, or some 350 feet east of it. In 1955, a number of B-47 multijet aircraft were assigned to Altus and were continued there until October 1957 when KC-135 jet tankers and the even larger B-52 jet bombers replaced them. The Base is also utilized by piston-driven aircraft, but we are concerned only with the jet traffic. From July 1955 to September 1957, jet flights averaged approximately 286 per month; from November 1958 to March 1959, after the runway was rebuilt, jet traffic increased to an average of about 407 flights per month. Figures are comparable, though somewhat lower, for a later period.
On normal landings as well as during various types of practice maneuvers the jets make a great deal of noise and cause vibration. Plaintiffs suffer from these disturbances and have brought these two suits to recover just compensation for the taking of avigation easements over their lands. Most of the Trial Commissioner’s findings are undisputed at this stage. He determined that the Government has appropriated easements of flight over each of the six parcels. Defendant accepts that part of the findings,[2] but believes the allowances for just compensation are too high. Plaintiffs have embraced the recommended findings in their entirety. The sole question, therefore, is whether we should reduce the allowances. We treat first with the contentions running to a group or all of the tracts and then turn to those which relate only to specific tracts. For the standards under which we consider such exceptions to the findings of the Trial *475 Commissioner, see Davis v. United States, decided today, post, p. 612.
1. It is urged that some of the plaintiffs are entitled to recover nothing, for the decrease in value of their improvements because the flights occurred, mainly, over unimproved portions of the parcels. The Government’s theory is that compensation is limited solely to losses directly under the line of flight, regardless of the damage caused to the remainder of the tract. Plaintiffs answer that the proper fashion for determining just compensation is to compare the fair market value of the whole tract before the taking with the fair market value afterwards. Plaintiffs’ criterion is correct. See e.g., United States v. Miller, 317 U.S. 369, 375-76 (1943); United States v. Grizzard, 219 U.S. 180, 183 (1911); Slattery Co., Inc. v. United States, 231 F. 2d 37, 46-47 (C.A. 5, 1956); United States v. 2,648.31 Acres of Land, 218 F. 2d 518, 520-21 (C.A. 4,1955). See, also, United States v. Virginia Electric & Power Co., 365 U.S. 624, 630-31 (1961). The gravamen of an action for the taking of an easement of flight is the unreasonable interference with the use and enjoyment of the land. Actual invasions by low-flying aircraft (at frequent intervals) over some part of a tract may be necessary, in the present state of the law, to trigger the right to relief. See United States v. Causby, 328 U.S. 256, 265-66 (1946); Batten v. United States, 306 F. 2d 580 (C.A. 10, 1962), cert. denied, 371 U.S. 955 (1963). Once this threshold is passed, the amount of recovery will depend upon the extent of the interference as it affects the fair market value of the land. Among the factors to be taken into account are: the location of the overflights, the frequency with which they occur, the use to which the land is being put, the use to which it might be put, the nature and extent of the improvements, and the size of the tract. The portion of the land over which the incursions occur supplies only one element. If the flights are directly over a residence, the decline in value in that improvement, and therefore of the land as a whole, is likely to be more substantial than if the flights were confined to the cropland portion, a great distance from the home. It may be, however, that the noise and vibration can be almost as annoying where the flights are somewhat off to the side as *476 where they are directly over the improvement; that is the situation with respect to some of these tracts. There is no showing, and no reason to believe, that the Commissioner has failed to give due weight to the location of the overflights in relation to the other factors.[3]
2. Defendant suggests that the Commissioner has considered irrelevant material in arriving at the amounts of certain allowances. The parcels involved (tract 3 in No. 31-59 and tracts 1-4 in No. 349-59) are close to the Base and subject to disturbances created by aircraft on the field warmup aprons, prior to take-off. The Government maintains that damage caused by such use of adjoining lands is not properly to be included in compensation. Cf., e.g., Campbell v. United States, 266 U.S. 368, 372 (1924) ; United States v. Kooperman, 263 F. 2d 331 (C.A. 2, 1959) (per curiam); Nunnally v. United States, 239 F. 2d 521, 524 (C.A. 4, 1956); Boyd v. United States, 222 F. 2d 493, 494-95 (C.A. 8, 1955). Two of the owners did testify that their tracts were subject to noise from the warm-up pads. But the record lacks any indication that the Commissioner took this testimony into account; on the contrary, the recommended findings show that he was concerned only with the interference caused by low-altitude overflights. It was defendant itself who, on cross-examination, elicited this testimony; disturbance from the warm-up pads formed no part of plaintiffs’ case and did not figure in the appraisals given by their witnesses.
3. The Mock Tract (tract 1 of No. 31-59). This land is part of a general diversified farming and livestock raising- and-feeding operation. There are facilities for feeding and fattening 6,000 cattle and 10,000 sheep. For several years prior to the taking, the owner of the tract had leased the cattle-feeding pens and received a net income of $12,000 per *477 year. In June 1959, after the taking, plaintiff sold 37.5 acres (comprising most of the cattle operation) for $35,000. The sheep-fattening facilities were abandoned after the first jet flights. The Commissioner has found that this plaintiff is entitled to $20,000 as compensation for the diminution in value of his land and improvements. The Government’s expert judged that the decrease was only $7,200; it urges, therefore, that this latter amount be adopted by the court.
Defendant insists that the primary loss is the delay in the cattle-fattening process caused by the frightening overflights; all other factors, it says, are too speculative. It is argued, in addition, that the fact that plaintiff obtained nearly $1,000 per acre when he made the sale referred to above (subsequent to the taking) shows that there was little decrease in worth. We do not agree that these points are valid. Defendant neglects, entirely, the loss on sheep-feeding. Plaintiff had to abandon the entire sheep-fattening activity within a year after the jets arrived at Altus. The sheep pens are no longer used for any purpose; the facilities for sheep and cattle are not interchangeable. As for the cattle-feeding operation, the delay in the rate of weight-gain should not be minimized; with a constantly changing bovine population, the loss can be substantial. In addition, the noise often stampedes the cattle, with injury both to them and the property. These stampedes take place once or twice a month, much more often than before the first jet flights. Plaintiff had received a net rental of $12,000 per year from the cattle-feeding operation; he sold it for only $35,000 (less than three times that figure). These facts, together with the abandonment of the entire sheep-feeding business and improvements, show that the Commissioner’s $20,000 allowance is well within the range of reasonableness. There is also the added element of the probability of expansion of the cattle-feeding business were it not for the jet flights; there was evidence that circumstances would have been favorable for growth and that plaintiff could have devoted 70 acres to the business instead of 37.5 acres.
4. The Wilks Tract (tract 3 in No. 31-59). The Commissioner considered the fear of possible plane crashes as an element in the reduction of the market value of this parcel, *478 well adapted to home and farm use. Defendant says that this should not have been given any weight because there was insufficient proof that such a fear was so widely held as to affect the worth of the land. We do not think that it was necessary for plaintiff to bring in a whole bevy of witnesses to say that they would not wish to live or work on this tract because of the possibility of crashes. The area is less than a mile from the end of the field, and the projected centerline of the runway crosses it. In a word, the tract is directly under the established flight path. This is certainly substantial evidence, in itself, of the potential danger from crashes. There was also the supporting testimony of the owner and two expert witnesses, one of whom was a “real estate dealer and independent appraiser of wide experience in the immediate area." (Emphasis added.) Further bolstering this evidence was the fact that an airplane disaster did occur, in the vicinity, in 1959. It is not beyond judicial notice that the worth of land very close to a military airport is normally diminished to some extent by apprehension of damaging air crashes; the point is even less open to question when the land is, as here, directly under the line of flight and there is supporting testimony.
5. The Ethridge and Turley Tracts (tracts 1 and J¡. in No. 3J¡9-59). Adjoining these parcels is a tract of land which has been sold several times (sale 1 described in finding 25). It was conveyed in 1950 for $50' per acre and then sold twice, in 1952 and 1953, for $80 per acre, and then finally once again, in 1957, for $75 an acre. The Commissioner has found that tracts 1 and 4 declined in value by $25 and $29 per acre, respectively. The Government maintains that, at best, sale 1 shows that tracts 1 and 4 declined only $5 an acre (defendant’s expert believed only $4 per acre). But land values in the area had been generally rising between 1953 and 1957; the apparent decrease of only $5 per acre (in the value of the parcel involved in sale 1) actually represented much more of a decrease in value when adjusted to embrace this trend. Also, sale 1 involved basically unimproved, unoccupied land while tracts 1 and 4 are parcels on which the owners reside; on the Ethridge tract there is a modern three-bedroom home *479 and garage; on the Turley tract there is a two-bedroom frame home in very good condition.[4]
6. The R. V. Hall and Myrtle Hall Tract (tract # in No. 343-69) and the Ida Hall Tract (tract 3 in No. 349-59). These parcels are approximately y2 mile from the runway and 350 feet east of the projected centerline. Defendant argues that the interference from overflights is “minimal” because the aircraft usually proceed on landing and take-off in a north-south straight line and would only occasionally cross these tracts. As we point out in Davis v. United States, decided today, post, pp. 617, 618 (the facts are almost precisely the same), the fan-shaped approach zone, safety reasons, and the “human factor” indicate that deviations from the straight-line-of-flight are not uncommon. Here, the two tracts are extremely close to the projected centerline of the runway, a mere 350 feet to the east; we would be surprised if incursions of jet aircraft over these tracts were not frequent, rather than “minimal.”
As in the Dmis case, supra, defendant refers to a sale (sale 5 in finding 25) to show that land close to these two tracts brought a “top price,” and to the fact that improvements were made on one of the tracts, after the taking occurred. This, it says, shows that there was little diminution in value. The answer is the same as in Davis: the sale fails to show the value both before and after the first jet flights. Defendant might have contrasted sale 5 with other comparable sales to show that there was in fact only a slight loss; but it failed to do this — it did not offer such comparisons. ■As for the improvements, the plaintiff may have wished to continue living on the land because it had decreased in value and he could not afford to sell it, “or it might be that the land was an ancestral or long-continued home.” Davis v. United States, supra, post, p. 622. Once the owner had decided to remain on the land, the fact that the living quarters were made more comfortable does not convince us that we ought *480 to accept the low appraisals of defendant’s expert instead of the Commissioner’s determinations.[5]
Defendant has failed to sustain its burden of showing error in the Trial Commissioner’s findings. Judgments will be entered for the plaintiffs as recommended by the Commissioner. As a condition of these judgments, the respective plaintiffs will convey easements to defendant which grant the right to fly aircraft of any kind[6] over their respective tracts at elevations equal to or above the glide angle plane.
PINDINGS OP PACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and arguments of counsel, makes findings of fact as follows:
1. These two cases were consolidated for purposes of trial because of the similarity of the issues involved. During the trial of case No. 31-59 [7] claims with respect to Tract No. 2 (plaintiff Lola M. Morris) and Tract No. 4 (plaintiff W. W. Williams) were dismissed or withdrawn, leaving only Tracts Nos. 1 and 3 for adjudication in that group. Case No. 349-59 [8] includes four separate tracts.
2. The individual plaintiffs involved in these claims are all citizens of the United States and residents of the State of Oklahoma. At all times pertinent to this action they have been the owners of various tracts of land located in the immediate vicinity of Altus Air Force Base, near Altus, Jackson County, Oklahoma. The tracts owned by the respective plaintiffs, the improvements located thereon, the operations conducted by the respective owners, and other pertinent facts and circumstances relating to these tracts are as follows:

*481
Case No. 31-59

Tract No. 1: Plaintiff Ralph H. Mock owns this 293-acre tract described as: North Half of Section 23, Township 2 North, Range 20 West, Jackson County, Oklahoma. It was originally a half section (320 acres), but was reduced because of land taken for railroad right-of-way and highways. Plaintiff inherited this property from his father, who had purchased it in 1914. This tract is part of a general diversified farming and livestock-raising-and-feeding operation, which plaintiff conducts upon a total of eight and one-half quarter-sections of land, or 1,360 acres.
Plaintiff and his sons raise all of the crops common to the area, including cotton, feed grains, alfalfa hay, and forage crops. The farm unit is devoted extensively to raising feed crops and providing irrigated pasturage for cattle.
All of the land owned by plaintiff is utilized in the overall farming unit. Cotton and grain allotments are combined and placed upon the various tracts in a manner deemed to be most advantageous to the overall operation. This tract includes 196% acres of irrigated, cultivated land, which has been leveled and bordered to permit flood irrigation. The soil is exceptionally fertile, with permeable subsoil for good surface and subsurface drainage. Production of all the crops mentioned is well above the average. Plaintiff has maintained fertility by addition of huge quantities of manure from the cattle-feeding operation.
Approximately 38 acres are devoted to pasture. The balance of the land is set aside for the improvements, buildings, and cattle-feeding pens.
For a period of more than 30 years plaintiff carried on a cattle-feeding, or fattening, program as a part of his farming operations. These operations were expanded over the years, and the cattle-feeding phase has been a primary operation for some time. The other land has been devoted largely to raising more of the necessary feed for the feeding program. In addition to raising his own cattle, plaintiff has also engaged in feeding cattle for others on a contract basis.
In 1953, plaintiff entered into a written contract to lease the cattle-feeding operation to Altus Feed Lots, Inc. This *482 corporation is owned by D. S. Jackman, of Altus, also the owner of Leger Mill Co., a manufacturer of cattle feed. The lessee agreed to furnish all feed and to pay plaintiff pen rental of five cents per head per day for cattle and one cent per head per day for sheep, plus customary charges for any special services such as vaccinating, de-horning, branding, etc. This lease contract was renewed in 1954 and 1955, pursuant to a renewal option clause contained therein.
Paul Mock, son of plaintiff, managed the feeding operations during this period. The gross income from pen rentals was from $14,000 to $18,000 per year, out of 'which the cost of utilities and overhead for care of cattle was paid.
In December 1955 plaintiff entered into a new contract for the lease of the land and improvements used for cattle-feeding to Altus Feed Lots, Inc., for a 5-year term commencing May 1, 1956, at an equivalent of $12,000 per year. Cash rental for the premises was set at $9,000 per year, and, in addition, the lessee agreed to construct $15,000 worth of improvements during the 5-year term, which would revert to plaintiff at the end thereof. Paul Mock became the salaried manager of the feeding operation under this lease contract. Under this arrangement, plaintiff could feed his own cattle and sheep on portions of the tract not leased.
This contractual arrangement continued until December 1957, when the lessee gave notice of termination pursuant to the cancellation clause of the contract. Shortly thereafter, the contract was reinstated upon condition that plaintiff guaranteed the income would equal expenses plus the contractual rental; or, if it did not, the loss would be deducted from the rental. A new 1-year contract was executed in May 1958, embodying these terms.
The tract involved in this action contains all of the commercial feed lots and accessory facilities for such an undertaking. The headquarters and most of the improvements for the entire farming operation are also located on this tract. It is the base of operations and has been the so-called “nerve center” for plaintiff’s overall farming activities.
The commercial feed lot consists at present of some 37 acres in the northwest portion of the tract, with area available for expansion to a total of about 70 acres. The area *483 involved is an excellent location for a feed lot and the operations are well known throughout that general area of the State. It is on a payed highway which assures ready access to market during periods of wet weather. The feed lot is located on a small knoll which drains in all directions and has a permeable subsoil which tends to reduce the amount of mud in wet weather.
Adequate water, which is essential to a cattle-feeding operation, is provided by a private pipeline 1*4 miles long, connected with the city water system of Altus, Oklahoma. Much of the available water in the area is unsuitable for cattle, because of its high mineral and gypsum content. City water is suitable for the cattle-feeding operation, and, under plaintiff’s contract, an ample supply is assured for present and contemplated future operations.
Currently existing feeding facilities are adequate for 6,000 cattle and 10,000 sheep. The large number of cattle pens have been built to handle 100 to 300 head of cattle each. The pens are built by using heavy posts, enclosed by wire fencing and graded to reduce mud and standing water in the area. A black-top or asphalt strip has been placed along the inner edge of the feed lots, to provide a hard surface in the area where the cattle are fed.
Feed troughs or mangers line the cattle pens, on each side of a feeding alley, constructed of wood or concrete. The feed is unloaded into the troughs automatically from trucks moving along the alleys which have been provided. The alleys and access roads are all graded and graveled.
Other alleys and cutting chutes facilitate movement of cattle from one pen to another, or to the scales and loading chutes. A special chute permits loading of cattle into double-deck trucks for transportation. Another chute permits simultaneous sorting of the cattle into as many as four groups. These are built of wire fencing or wooden planks. There are also available appropriate pens and sheds for sick cattle, and many other structures which can be used for various purposes. In all, there are approximately 13,000 feet of fences and 5,000 feet of mangers and feed troughs.
There are also similar lots and pens for feeding sheep, located to the east of the cattle pens, nearer the runway *484 as extended. The sheep-feeding facilities are similar to the cattle pens, but, due to the difference in size of the animals, the facilities are not interchangeable. The sheep pens have been idle substantially all of the time since 1958, when sheep-feeding was discontinued, primarily because of the disturbance from low-dying jet aircraft.
The feeding pens have been constructed as needed during the period since 1952, and have been improved, repaired, and replaced from time to time. They have been designed to make it possible to feed the cattle and sheep with a minimum of effort and manual labor.
In addition to the cattle pens, the improvements utilized in the farming and cattle-feeding operations include: A large, modern home, formerly the residence of the owner, now used to house employees, and two other modem homes for workmen; a large hay barn 54 by 104 feet, with a capacity of 8,000 bales of hay; a large sheep barn 66 by 84 feet, which will hold 2,000 sheep; three grain storage bins of 1,000-bushel capacity; one grain storage bin holding 2,200 bushels; a cattle self-feeder, or metal silo, which, when filled with feed, permits cattle to feed out of openings at the base which are kept stocked by gravity flow; an office building to house the headquarters, commercial scales, maintenance garage and shop, and machinery sheds for trucks, tractors, and farm machinery; tanks and water troughs in each of the feed lots and feeding pens, all connected with underground pipes; and a complete outdoor lighting system which makes it possible to keep the entire area lighted at night.
In June 1959 plaintiff sold and conveyed the 37.5 acres comprising the feed lot to Leger Mill Co. (also a Jackman enterprise) for $35,000. The tract sold contained most of the existing cattle feed lots and feeding pens, but not all of the buildings and other improvements. The sheep pens, now largely unused, and the less desirable cattle pens nearest the runway were retained by plaintiff. These have been rented to Leger Mill Co. under an agreement that plaintiff shall receive as rental only the manure produced from cattle feeding thereon. The purchaser has access to the scales, loading chutes, and other facilities retained by plaintiff.
*485 The purchaser was able to continue the cattle-feeding operation, which accounted for some two-thirds of the total production of the feed mill, amounting to 10,000 to 12,000 tons of feed a year. The lot is only three miles from the mill on an all-weather road, thus reducing transportation cost.
It is Mock’s view that the sale to Leger Mill Co. was, in effect, a sale which he was forced to make, since he was unable to resume feeding operations himself under the adverse conditions caused by low-flying jet aircraft. It was not a forced sale in the normal, generally-accepted use of such description. Plaintiff testified that he would not have sold the feed lots but for the fact that, based on past experience, “We did not think we would be able to keep the feed lots full and operating at a profitable capacity.”
The multi jet bombers and tankers flying over the property at low altitudes have a measurable adverse effect on both the behavior and the rate of weight gain of the cattle.
The intense noise of a passing jet frightens the cattle, especially for a period of about one week when they first arrive at the lot. The cattle stampede more frequently, breaking through fences, and destroying the chutes and pens. Considerable labor is now utilized in repairing and reconstructing fences and corrals so destroyed. Damaging stampedes now occur once or twice a month, many times the rate prior to jet flights. Some actual injury to the cattle results from these occurrences.
Sheep react more strongly to the noise of jet aircraft. Frightened and nervous by nature, they run blindly, piling up and injuring or killing some of the animals. The sheep-feeding pens happen to be located closest to the runway, and facilities for sheep and cattle are not interchangeable. Based on experience as a result of the disturbance from overflying jet aircraft, plaintiff discontinued sheep-feeding altogether in 1958. The sheep-feeding facilities have been virtually unused for several years, and have become useless at the site. The record indicates that some profit was realized from the sheep-feeding operations prior to the flights of the large jet aircraft, but specific proof from plain *486 tiff’s books and records as to the amount of profit is lacking in this record.
In addition to injury to cattle and equipment, the low-flying jet aircraft cause a measurable setback in weight gain of cattle being fed for market. For the first few days the cattle gain little or no weight. They usually begin to gain within a week after arrival at the feed lot. At the average cost for feed of 50 to 60 cents a day, the setback causes a net loss of $5 to $7 a head. Since custom feeding of cattle operates upon an extremely slim margin of profit and on a large volume, the setback may well make the difference between overall profit and loss.
Aside from direct effect upon cattle, the low and frequent flights of jet aircraft cause additional labor cost in sorting and shipping cattle, in rebuilding damaged pens, and in re-sorting after stampedes. Noise prevents telephone conversations, and, since all buying and selling is done by long-distance telephone there is some extra expense involved.
Prior to the commencement of low flights by jet bombers and tankers, this was one of the best located and most desirable commercial feed lots in the entire area. Ample water and feed were available nearby. Paved roads provided easy access. The physical features of the site were excellent. The improvements were adequate and designed for economical operation. There was ample room for expansion and a reasonably anticipated business would have warranted further expansion. As a result of the disturbance from jets operating from the Air Base, the property has been rendered less desirable for commercial cattle-feeding operation. The present owner continues such operations to protect its large investment and because the presently existing facilities are near a feed mill owned by the same concern which carries on the feeding operation. The site still has considerable value as a commercial feed lot.
Plaintiff investigated the possibility of moving the operation to another site, and offered testimony that no available comparable site, with adequate water supply and easy access, was found. There are other sites within the same general area which could be used for feed lots if the City of Altus, Oklahoma, would furnish water for such *487 locations on the same terms that water was previously made available to plaintiff. The evidence offered with respect to the possibility of currently obtaining necessary water from the City of Altus for additional feeding lots, if and when constructed, is in conflict because of the increased amount of water now required for the City of Altus and its inhabitants. The cost of building cattle pens and feed lots elsewhere comparable to what plaintiff has constructed, would be very high, but not necessarily prohibitive.
Jet aircraft pass directly over this tract, both on taking off and landing at the Base. They pass close to some of the feed lots and close enough to the areas where cattle are kept to be very disturbing. This sometimes causes injuries to the livestock. Generally, the large jets are at an altitude of 200 to 300 feet as they pass over, although some go over at a lower altitude. Eepeated practice landings and low approaches have been particularly disturbing to the operation of the feed lots.
The cattle-feeding operations constituted an integral part of plaintiff’s overall farming operation. It profitably utilized the large amounts of feed and feed crops raised on this and other land owned by plaintiff; however, the commercial cattle-feeding operation which Mock sold to Leger Mill Co. was carried out through use of Leger Mill’s feed. The cattle are fed a period of 60 to 120 days, either for a fee or resold at a profit. The huge quantities of manure produced can be sold or utilized on the farm. The entire operation was a well-managed, integrated, and profitable agricultural enterprise, centering on the cattle-feeding operation. There was obviously a net profit from the feeding operation, but a specific amount, supported by competent evidence, is not available from the record presented.
The flight of aircraft has reduced the prior normal use of this tract for cattle-feeding purposes. Prior to commencement of jet flights, the property was a marketable and valuable site for commercial feed-lot purposes; thereafter both its value and marketability for such purposes have been decreased. This property is subject to a clearance easement.
Tract No. 3: Plaintiff Derwood Wilks is the owner of this 40-acre tract described as: South Half of the South *488 Half of the Southwest Quarter of Section 26, Township 3 North, Range 20 West, Jackson County, Oklahoma. Plaintiff has owned and lived on this property continuously since 1941, with his wife and two sons. This tract is half-mile from east to west, and 660 feet from north to south. The soil is a sandy loam, well suited for raising crops and pasturing cattle, as now utilized by Mr. Wilks.
Improvements consist of a three-bedroom, modern frame house, 28 by 54 feet, containing approximately 1,400 square feet of living area. The house is well-built, with insulated shingles on the outside, and a composition shingle roof. The home is carpeted throughout, painted, and in excellent condition. There is a garage and storeroom 24 by 32 feet, with a cement floor, and other sheds and outbuildings. The improvements are located some 600 feet east of the southwest corner of the tract. This tract lies about a half mile directly north of the extended center line of the north-south runway. Mr. Wilks farms part time and is employed in Altus as a dairy salesman.
Nearly all of the jet aircraft taking off and landing at Altus Air Force Base pass over this tract. Frequent flights pass directly over the house, especially on take-off, and other aircraft pass the house slightly to the east. There is substantial disturbance in each instance. Most flights pass over at altitudes of less than 300 feet. The noise of the jet aircraft passing over makes conversation impossible, interferes with the use of the telephone, and with television reception. The disturbing sound from each plane lasts for a brief period, with the most intense noise lasting about a minute as the airplanes pass overhead. The vibration of a passing aircraft rattles the glassware and shakes the entire house. Continuous vibration over a period of time causes the nails to loosen and work out of the sheet rock on the exterior walls. Cattle stampede and break through fences as often as twice a month. Eventually they get used to the aircraft noise, but suffer a weight setback following first arrival on the tract. Chickens scatter on approach of the jets, and never get fully accustomed to them.
Jet aircraft are normally louder on take-off. The B-52 is louder and more disturbing than the KC-135, As many *489 as 12 to 15 jet planes pass over this tract during the average day. Often the flights occur from 3 a.m. to about 10 a.m. and from 4 p.m. to about 9 p.m. The practice landings or low-approach maneuvers are executed over this property both day and night.
Members of this family are fearful and apprehensive of possible plane crashes, particularly since a B-52 crashed on take-off in 1958 or 1959 about three miles north of this tract. Night flying occurs on an average of five nights per week. The members of the family are awakened at night by jet aircraft passing overhead, and experience difficulty in getting back to sleep. The landing lights used on the jet aircraft light up the house as the aircraft pass over the property.
This property would be a desirable and readily-saleable property except for the low overflights of jet aircraft. Such flights have rendered it undesirable for occupancy as a residence, and its value for such purposes has been substantially decreased.

Case No. 849-59

Tract No. 1: Plaintiffs William T. Ethridge and Virgie Ethridge own this 160-acre tract, described as: Southeast Quarter of Section 26, Township 3 North, Range 20 West, Jackson County, Oklahoma. This tract is subject to a mortgage to Occidental Life Insurance Company of California. Plaintiffs have owned this tract since 1934, having lived there continuously, with the exception of one year, with their teen-age daughter and son. They farm the tract, together with other land in the vicinity.
The land is an undulating sandy loam farm, with 140-acres in cultivation. It is very suitable for growing cotton, grains, sorghum, wheat, and rice. Plaintiffs also raise livestock on this tract, usually in herds of 10 to 20 head, and also have a cotton allotment of approximately 47 acres.
The improvements on this tract are located on the east side of the quarter-section at about the half-way line. The house is a three-bedroom, modem home, in good condition. There is also a good well, garage, and barn. The improvements lie approximately one mile from the north end of the north-south runway at Altus Air Force Base. An extension of the center line on this runway north would cross this sec *490 tion slightly west of the west line of this tract. There is a clearance easement over the west 63 acres of this tract.
Jet aircraft pass over this tract and over the improvements both on take-off and landing. When the wind is in the north, the jet aircraft make a turn on take-off, bringing them directly over the house. The noise makes conversation impossible and interrupts telephone service and television reception. The vibration causes the house to shake and makes the windows rattle.
Aircraft practicing low-approach maneuvers veer off to the east and pass over the plaintiffs’ home. On occasion, in practicing landings, a number of planes will follow each other at short intervals. Jet flights occur both in the daytime and at night, and frequently disturb the sleep of the family. Night flights occur during about half of the nights, at times from 11 p.m. until 4 a.m. The aircraft pass over this tract as low as 300 feet. The overflights of aircraft impair the value and utility of the property as a home, and make it disagreeable to live there.
Traot No. 2: Plaintiffs R. Y. Hall and Myrtle L. Hall own this 100-acre tract, described as: East Half and South 20 acres of West Half of Northeast Quarter, Section 35, Township 3 North, Range 20 West, Jackson County, Oklahoma. This tract is subject to a mortgage to Federal Land Bank of Wichita, Kansas. Mr. and Mrs. Hall live on the tract and have owned it for the past 37 years. Mr. Hall farmed it until 3 years ago. Hue to a heart condition from which he suffers, the farm is now rented to William T. Ethridge, another plaintiff in this action. This tract is gently sloping, sandy farmland of average productivity. Approximately 75 acres are in cultivation and 22 acres in pasture. There is a 32-acre cotton allotment on this tract, and a wheat allotment of 15 acres. At the time of the partial taking there was a three-room house on this tract which had been the owners’ residence for 35 years. This was sold and moved away about 3 years ago, and another house moved onto the property.
Jet aircraft taking off and landing at Altus Air Force Base fly over this tract at altitudes of 500 feet or less. Occasionally the jets have flown directly over the improvements as they engaged in low approach maneuvers when they *491 turned to the northeast after clearing the Air Base runway. The jets fly over the tract in the daytime and at various times during the night.' Night flights occur about three nights a week. On some days there are as many as 15 to 20 aircraft, of various types, crossing over this property.
The noise from jet aircraft is deafening at this location, when jet aircraft pass over the west part of the tract or over the house. Conversation is rendered impossible during a period of a minute or so of intense sound as each jet plane passes over. The jet flights shake the house, rattle windows, and shake things hanging on the walls. Plaintiffs had intended to live on and continue to 'occupy these premises as a home before the commencement of low-altitude jet aircraft flights over this tract.
The flights of jet aircraft over this tract at low altitudes have impaired its value and its marketability as a homesite.
Tract No. 3: Plaintiff Ida A. Hall owns the 60-acre tract described as: Northwest Quarter of Northeast Quarter and North Plalf of Southwest Quarter of Northwest Quarter, Section 35, Township 3 North, Kange 20 West, Jackson County, Oklahoma. Plaintiff has lived on this tract continuously since December 1904. She inherited this tract as part of the original family homestead. It joins the property of her brother, B. V. Hall, another plaintiff in this action, located immediately east of her tract. Miss Hall has always used the land for farming purposes and actually supervised the farming until 2 years ago, when she rented the tract to a neighbor, William T. Ethridge, another plaintiff in this action. This tract has fine sandy loam soil, with 51 acres in cultivation and eight acres in pasture. It is good cotton land and well adapted for alfalfa and other feed crops.
The improvements on this tract consist of an old frame house with wooden shingles, 30 by 30 feet, with a lean-to room which has been added to the south side of the house. It is supplied with well water adequate for household use. There are a large number of tall trees around the house. It would be a desirable place to live were it not for the overflight of jet aircraft. The improvements are located on the northwest portion of the 60-acre tract, and slightly east of *492 an extension of the center line of the north-south runway of Altus Air Force Base.
Nearly all of the jet aircraft taking off or landing at Altus Air Force Base pass over this tract. Many of them pass directly over the house at very low altitudes. They fly over in the daytime and at night in great numbers, and disturb the sleep of the plaintiff. They appear to be lower when landing, but the noise and disturbance is louder on take-off. The house vibrates as the jets pass over. Plaintiff testified that until the flights of jet aircraft began, it was her desire to continue to live there; but that she now remains there only because she has no choice. As many as 20 flights pass over her house in a day, and approximately the same number during the night. Often the flights commence about 3 a.m. and continue for some time, beginning again about 4 p.m. and continuing until 9 or 10 p.m.
Plaintiff estimated that some of the planes pass over at altitudes of 50 feet, and stated that some of them seem to barely clear the top of her house.
This property has been rendered undesirable for occupancy as a residence by reason of the multijet aircraft passing over at very low altitudes. If it were not for the low-flying aircraft, it would be a desirable building site for a semi-suburban farm residence.
Tract No. 4' Plaintiff R. C. Turley owns this 120-acre tract described as: North Half, and North Half of South Half, of Southwest Quarter, Section 26, Township 3 North, Range 20 West, Jackson County, Oklahoma. Plaintiff has lived on this tract practically all of his life, and has owned it since 1938, when he purchased it from his father. Plaintiff occupies this tract as his home, and conducted farming operations thereon until 2 years ago, when he retired and put the land in the soil bank.
The land is level and of a sandy loam type. There is a 20-acre pasture, with the balance of 100 acres in cultivation. There is a 16-acre tract adjacent to the improvements which is very good soil, suitable for raising cotton, alfalfa, or wheat. The improvements include a modern, two-bedroom, frame home, in very good condition. The outside is covered with asbestos shingles, and it has a com *493 position roof. There is a good well, a combined wash house and garage, and an old bam. These improvements are located on the west side of the tract approximately in the center from north to south. At times jet aircraft fly over the tract at low altitudes. The flights occur in daytime and at night. Sometimes the aircraft seem to be in almost continuous flight. On an average of two to three nights a week the flights continue until late at night. Most of the planes pass over a short distance east of the house, but the noise is still very disturbing. Occasionally they fly directly over the house.
The noise and vibration of jet aircraft going over at low altitudes is very disturbing. Conversation is rendered impossible during such periods and the use of the telephone and television is interrupted as each plane approaches and passes over. The sleep and rest of the occupants of the tract are disturbed at night. The house shakes and vibrates as the jets pass over. Plaintiff estimated that the B-52 and KC-135 aircraft pass over his land and his home as low as 200 to 300 feet. Defendant admits that planes may fly over this tract at low altitudes while landing on the GCA (ground control approach) glide path, but contends that if they pass over the improvements it would be at altitudes in excess of 500 feet.
3. Altus Air Force Base was originally established as a flight-training base during World War II. At the end of the war it was released to the War Assets Administration, which agency conveyed the property to the City of Altus in 1948. In 1955 it was reconveyed to the United States, having been previously reactivated as a part of the Tactical Air Command.
Various propeller-type aircraft first used the Base after its reactivation. Jet aircraft first arrived at the Base in 1955. B-47 jet bombers were assigned to the Base between April 1955 and October 1957. In October 1957 they were replaced by B-52 multijet bombers and KC-135 multijet fuel tankers.
The Altus Air Force base has been and is now operated as an installation of the Strategic Air Command, and a base for heavy, long-range, tactical jet aircraft. Units assigned to the Base include a B-52 Bomber Squadron and an Air *494 Kefueling Squadron, equipped with KC-135 jet tankers, and other supporting units.
4. The first flights of jet aircraft commenced in April 1955, after the single north-south runway had been enlarged from 200 by 10,800 feet to 300 by 13,440 feet. Between July 1955 and September 1957 there were an average of 286 jet takeoffs and landings per month by B-47 bombers. During this period C-119 nonjet cargo aircraft were also assigned to the Base.
The B-47 jet bombers were replaced by B-52 bombers, which utilized the Base between February 1958 and August 1958, at which time all aircraft were moved temporarily to Clinton-Sherman Air Force Base, while the runway was being rebuilt. The jets returned to the Base in November 1958. Thereafter, jet take-offs and landings by B-52 and KC-135 aircraft averaged some 407 per month, between November 1958 and March 1959, or approximately 13 per day. In the period between April 1960 and March 1961, the jet take-offs and landings ranged from 253 per month to 467 per month, with an average of 322 per month, or slightly over 10 per day. Specific records for other periods are not available, but there was a similar number of jet flights. These figures do not include nonjet air traffic at the Base.
5. Altus Air Force Base has a single north-south concrete runway 300 feet wide and 13,440 feet long. At each end is a paved over-run extension to the runway, or safety zone, 1,000 feet long and 300 feet wide. At each end of the runway there is a rectangular clear zone, 1,000 feet long by 1,500 feet wide, which encompasses the over-run extension. It is a safety area, not intended for use by aircraft.
Superimposed upon the so-called approach zone at each end is a clearance easement area, where the defendant has acquired the right to raze and remove structures extending above the glide angle plane. The clearance easement extends outward for a distance of some 6,500 feet from the end of the clear zone, at which point it is approximately 3,000 feet wide.
Part of each tract involved in these actions is located within the approach zone and within the clearance easement area. The United States has acquired clearance easements *495 upon lands located in the clearance easement area by purchase or condemnation, for which the respective plaintiffs have received payment.
The clearance easements previously acquired by the United States give it the right to limit height of structures or vegetation extending above the glide angle plane. Such easements did not confer upon defendant the right to fly aircraft at low altitudes over the land.
6.The various tracts of land involved in this action lie in the vicinity of the north or south ends of the runway at Altus Air Force Base, partly within the approach zone, and at or near the extended center line of the runway. The following table shows the approximate position of each tract in relation to the runway. Distances are to the nearest corner of the tract, and are approximate:
Distance from Distance from
Case Tract No. end of runway projected center line
No. 31-59-1 (Mock)_ 2.850 ft.. OL bisects.
No. 349-59-1 (Ethridge).. 4,850 ft-360 ft. east.
3 (wilks). 4.850 ft_. CL crosses.
2 (R.V. Hail). 2,300 ft.. 360 ft. east.
3 (Ida Hall)_ 2,950 ft_. 350 ft. east.
4 (Turley)— 6,550 ft-CL crosses.
7. Within the approach zone at each end of the runway there is a minimum safe glide angle to be observed by aircraft. This angle begins at ground level at the outer edge of the clear zone, 1,000 feet beyond the end of the concrete runway, rising at a 1:50 ratio (one foot vertically for very 50 feet horizontally). The glide angle establishes a clearance criterion, a line above which all structures and vegetation will be removed; and also establishes an absolute minimum elevation for safe flight.
8. The Base is equipped with ground control approach (GCA) equipment, a radar system for landing aircraft by instructions given by radar from the ground. Approximately 90 percent of all landings by B-52 and KC-135 aircraft are under GCA supervision. An electronic flight path is established for aircraft landing under GCA direction, which commences at a touchdown point on the concrete *496 runway, 750 feet from the end thereof, and extends upward over the projected runway center line at an angle of 2.5 degrees. Although the contour of the land will affect the actual elevation of this line above the ground at any particular point, there is little difference in ground elevation moving in either direction from the Base.
9. Below the GCA flight path is another imaginary line designated the lower safety limit for GCA landings. This line rises at a 2° angle, and determines the point at which aircraft attempting to land under GCA control have fallen far enough below the GCA flight path to require the pilot to execute a missed approach. It is then necessary for him to regain altitude, and circle for another landing attempt. The GCA operates through radar equipment on the ground. As the aircraft approaches for landing, the pilot is given oral instructions as to his direction with respect to the runway and his altitude with respect to the GCA flight path. When the aircraft is below the GCA flight path, but above the lower safety limit, the pilot is so informed, to enable him to correct his angle of approach. When the pilot encroaches on the lower safety limit, he is directed to execute a missed approach, and to await instructions for another landing attempt.
The base is also equipped with instrument landing system (ILS) at the south end of the runway only. The device transmits automatic electronic signals designed to guide the pilot to the GCA flight path, and to inform him of deviation from it. This device exercises no control over pilot action.
10. The elevations of the glide angle, GCA flight path, and GCA lower safety limit as to the point of each tract nearest the runway, are as follows:[9]
*497 Case Tract No. Elevation of glide angle Elevation GCA flight path Elevation lower safety limit
No. 31-59.. 1 (Mock)_ 63 ft.. 150 ft.. 125 ft.
No. 349-59. 3 (Wilks).. 1 66 ft.. 66 240 ft.. 190 ft.
2 (R. V. Hall)., 3 (Ida Hall).... 4 (Turley)__ 24 ft.. 32 ft.. 75 ft.. 135 ft.. 140 ft.. 265 ft.. 120 ft. 125 ft. 200 ft.
11. The principal aircraft assigned to Altus Air Force Base have been B-52 jet bombers and KC-135 jet refueling tankers. Other aircraft, both jet and nonjet, use the Base regularly. The jets are described as follows:
B-52: An eight-jet, sweptwing, long-range, heavy bomber, is is one of the largest tactical aircraft of the U.S. Air Force. Its dimensions and characteristics are:
Length, 157 feet, 7 inches.
Wingspan, 185 feet.
Height, 40 feet, 8 inches.
Loaded weight, 488,000 pounds.
Service ceiling, over 50,000 feet.
Range, 9,000 miles.
It is capable of speeds in excess of 650 miles per hour, and can be refueled in the air. Its eight Pratt & Whitney J-57P-43-W turbojet engines are mounted in pairs in four nacelles, two on each side of the fuselage. Each jet engine is capable of 13,750 pounds of thrust.
KG-135: The Boeing Stratotahker is similar to the Boeing 707 commercial jet airliner, and is designed for high-altitude refueling of other jet aircraft, especially B-52 bombers. Dimensions and performance characteristics are:
Wingspan, 130 feet, 10 inches.
Length, 136 feet, 3 mches.
Height, 38 feet, 5 inches.
Loaded weight, 297,000 pounds. Maximum speed, 642 miles per hour. Service ceiling, 45,000 feet.
The KC-135 is equipped with four Pratt & Whitney J-57P-31 turbojet engines, each capable of delivering 12,485 pounds of thrust.
12. The load being carried and the weather, including wind, temperature, and barometric pressure, determine the *498 amount of runway necessary for take-off. With, an average load and at 70° to 80° temperature, the B-52 jet bombers require approximately 10,000 feet of runway to leave the ground. Upon occasion, as much as 11,200 feet is required. The KC jet tankers require from 9,500 to 10,300 feet of runway for take-off. With a heavier load or under adverse weather conditions, the aircraft require more runway, and gain altitude more slowly after take-off. Both types of large jets use water injection to increase the efficiency of the jet engines on take-off.
Take-off is controlled by factors of time and speed. The aircraft must reach certain set speeds at specified intervals after commencement of take-off. Procedure after take-off also is governed by attainment of specified speeds. Thus the height of aircraft over a particular point will vary with weather conditions and the speed attained in the particular take-off operation.
From take-off, the B-52 climbs at a relatively constant rate of approximately 800 feet per minute, at a ground speed of three nautical miles (approximately 18,180 feet). All of the tracts here are within two nautical miles of the point at which the aircraft would leave the ground under the most favorable conditions and within approximately one mile of the point at which they would leave the ground under less favorable conditions. However, the R. Y. Hall, Ida Hall, and Ethridge properties, located at the north end of the field, are not in the direct line of flight on take-off or landing.
The KC-135 climbs to an elevation of approximately 500 feet, where it assumes a more level flight, adjusts flaps and accelerates to a climbing speed.
Jet aircraft taking off to the north must clear a mountain range, 15 miles north of the runway, having an elevation of 2,500 feet above sea level, or 1,200 above runway elevation. Aircraft must have climbed 1,500 feet in the distance of 15 miles to clear this obstacle by 300 feet, or 2,200 feet to clear it by 1,000 feet. Taking off to the south, the aircraft generally reach 1,000 feet above the .ground somewhat before they reach the TVOR[10] Station, which is approximately nine miles south of the runway.
*499 13. The jet bombers fly tactical missions of varying lengths, up to 10 or 12 hours in the air. Tankers fly missions to refuel bombers. Instruction in navigation and in practice landings takes place on return from a mission. The jet aircraft leave for and return from these missions both in the daytime and at night, as the mission requires. For tactical missions and on regularly scheduled refueling missions the aircraft is fully loaded.
14. A maneuver no longer used at the Ease, performed by the B-47 jet aircraft when assigned to the Base — and later by the B-52 and KC-135 jets — is known as “touch-and-go” practice landing. The aircraft approaches for landing in the normal manner, either under GCA direction, or by visual approach. Upon landing, and while still rolling, the power is re-applied and the aircraft takes off. The aircraft then circles to the east, re-enters the landing approach pattern, and repeats the maneuver.
In executing such a maneuver, the pilot would be free to turn to the east upon clearing the field boundary. If he did so, he would probably pass over the Ida Hall and E. V. Hall properties.
At times, several of the large jet aircraft circle the field, practicing approaches and landings, and each plane circles and approaches the field a number of times. At these times, both in daytime and at night, the disturbance from jet aircraft is almost continuous.
The low approach is identical to the touch-and-go maneuver, except that the aircraft never actually touches the runway, descending only to a point approximately 500 feet above the ground before re-applying power. When the Base was first reactivated, touch-and-go operations were conducted with B-47 jet bombers, and later with B-52 and KC-135 aircraft, but they had been discontinued in favor of low approaches by the time of trial.
A B-52 jet bomber crashed about three miles northwest of the runway in 1958 or 1959. All of the crew except one were killed, and the crash caused extensive damage in the crash area.
15. Aircraft taking off from Altus Air Force Base regularly pass over each of the respective tracts involved in these actions at varying altitudes, often below 500 feet. *500 Upon landing, they pass over the same tracts in a descending course at similar altitudes. Other maneuvers, including low approaches, the touch-and-go operations formerly performed, and varying approach and departure patterns cause the multijet aircraft to pass over these lands at low altitudes. All aircraft take off and land into the wind, so that jet aircraft either take off over a particular tract, or pass over it when landing.
16. In some cases, the normal flight pattern causes the jet aircraft regularly to pass over portions of the tracts, and infrequently over the improvements. There is no substantial difference in the intensity of noise and vibration of these large jet aircraft whether they pass directly overhead or slightly to one side. Likewise, there is no great difference in the amount of disturbance in relation to distance from the end of the runway. The noise and vibration from four or eight powerful jet engines is so deafening, that the noise and disturbance is substantially the same despite a difference of a hundred feet or so in the altitude at which the jets normally pass overhead.
17. The low flights of extremely large and powerful multi-jet bombers and fuel tankers over the respective tracts involved in this action have caused annoyance and inconvenience to the respective plaintiffs, and to other occupants of homes located thereon. These are among the largest and most powerful jet aircraft now manufactured, and also the noisiest. The noise of low-flying jet aircraft is terrifying, especially to children. Each time a plane passes over, conversation is impossible for a period of about one minute. Telephone conversation is impossibile, and television reception is interrupted. The buildings, and especially the homes, rattle and vibrate as the aircraft pass overhead.
Occupants of the tracts are disturbed in their sleep when these jet aircraft take off and land during the night. Takeoffs and landings late at night and in the very early morning are common. Repeated practice landings and low approaches frequently continue until late at night.
Plaintiffs are fearful of death or injury from an aircraft crash, especially a fuel-laden tanker.
*501 18. The highest and best use to which the tracts of land here involved could reasonably be devoted is that to which they have been devoted. The Mock tract (Tract No. 1, Case No. 31-59) includes a commercial feed lot. All other tracts involve owner-occupied farms and rural residences, devoted to diversified farming and raising of cotton, grains, livestock, dairy cattle, or a combination of such operations. In their best use, the farm properties would be occupied as a residence and homestead by the owner, with improvements designed to provide an adequate farm home or suburban residence for the owner and his family.
19. The noise and the disturbance to peace and quiet experienced by the owners and occupants of these tracts from low-flying jet aircraft taking off from and landing at Altus Air Force Base, together with danger from possible aircraft crashes, have decreased the fair market value of each tract.
Under normal conditions and circumstances, each of these tracts would be marketable and desirable for the use to which it is now being devoted. The saleability and marketability of each tract for its particular highest and best use has been reduced. The value of the Mock tract for feed-lot purposes has been impaired; and the value of the other tracts for residential purposes has been diminished.
In each case, the fair market value of the entire tract has been decreased because of the taking of an easement of flight over all or a portion of each of these tracts.
20. Defendant’s appraisal testimony supports an award of just compensation in some amount as to each tract. The controversy relates primarily to the amount which would constitute just compensation for a partial taking as to each tract involved.
21. Expert witnesses were called by each party to testify as to the fair market value of each tract, and the decrease in its value caused by the taking of an easement for flight of jet aircraft.
Witnesses for plaintiffs were Charles D. Thomas, an experienced independent appraiser of Tulsa, Oklahoma, specializing in the sale and appraisal of rural properties in Oklahoma; and Maurice Mahan of Altus, Oklahoma, real estate dealer and independent appraiser of wide experience in the *502 immediate area. Defendant offered the testimony of Hugh A. Aarant, an employee of the Corps of Engineers, U.S. Army, from Dallas, Texas.
The testimony of these appraisers and the plaintiffs as to fair market value of each tract, before and after the overflight of aircraft, is set out below.
Tract No. Before (subject to clearance easement) After Difference
Case No. 31-59:
1 (Mock):
Mock..
Paul Mock_
Mahan_
Aarant_
3 (Wilks): Owner.—
Thomas_ Mahan_ 10,000 9,600 6.500
Aarant_ 16,095 14,595 1.500
Case No. 349-59:
1 (Ethridge): Owner_ Thomas_ 21.500 20.500 14,000 15,000 7.500 5.500
Aarant_ 21,347 20,712 635
2 (R. V. Hall):
Owner_ Thomas_ 15,000 11.500 10,000 8,000 5,000 3.500
Mahan_ 10,760 7,232 3,528
Aarant_ 15,349 14,949 400
3 (Ida Hall): Owner_ 9,000 3,500 5.500
Thomas_ 7,000 3,000 4,000
Mahan_ 6,240 2,296 3,944
Aarant_ 8,076 7,009 1,000
4 (Turley):
Owner_ 24,000 15,000 9,000
Thomas_ 19,800 13,300 6,600
Mahan_ 17,588 11,246 6,342
Aarant_ 850
22. Land prices have been generally increasing in the area over a period of several years before and after the taking.
There have been no actual sales of improved farms located close to the end of the runway, and subject to low flights of jet aircraft. Eecords of sales provide information as to values prior to commencement of jet flights, and also current values outside the area of jet operations. There have been sales in areas subject to some jet interference, but more distant from the runway than the tracts here in suit. There is no evidence, except expert opinion, as to what the sale price of those properties would have been if it were not for jet operations.
*503 23. Actual sales in the area provide no clear measurement of decrease in market value from low flights of jet aircraft, especially with respect to tracts close to the end of the runway where the jet aircraft pass over at low altitudes. In the final analysis, the appraisals of the expert witnesses for both parties were based primarily upon the individual judgment of the respective witnesses as to how much the value of a particular tract has been reduced as a result of the jet flights.
24. In most cases, the testimony of the witnesses as to value of the individual tracts prior to jet operations was similar, and the variations were within the bounds of professional judgment. The disagreement arises in the appraisal of fair market value of the properties before the low flights of jet aircraft, and the market value after the taking of a flight easement.
Mr. Thomas and Mr. Mahan, witnesses for plaintiffs, based their appraisals upon the difference in fair market value of the respective farms, as farming units, resulting from low-flying jet aircraft. They relied upon a study of published articles, appraisal of flight easements, a study of real estate values and comparable sales in the area. They also relied upon many years of personal experience in real estate appraisals, including appraisal of easements and other partial taking cases.
These witnesses considered the noise and disturbance caused by jet aircraft flying over the improvements or over the land near the improvements, and the danger of falling aircraft or airplane crashes, as the primary factors affecting market value. The appraisals reflect decrease in value of the property as a whole, rather than specific damage to any particular portion of the property involved.
Mr. Aarant, appraiser for defendant, concluded that only the portion of each tract within the clearance easement area suffered any decrease hi value from jet operations. Where the improvements were located outside the clearance easement area, no decrease in value of such improvements was found by the appraiser even though considerable noise and disturbance admittedly occur at locations outside the clearance easement area.
*504 In these cases, decrease in value was calculated by assessing a land damage value per acre for the acreage within the clearance easement, and applying a similar damage to any improvements lying within the clearance easement area. Thus, no decrease in improvement value was appraised as to the Ethridge, Turley, and R. Y. Hall tracts; and as to the Mock tract, a decrease in value was appraised only in that small portion of the improvements lying within the clearance easement area.
In making these appraisals, Aarant assumed that if jet aircraft did fly over the portions of the tracts outside the clearance easement area, they flew over at altitudes above 500 feet. In this assumption, the witness has stated that he relied upon information and instructions given him by the Air Force, and other directions given him, to find no decrease in .value of improvements outside the clearance easement area.
Thus, Aarant’s appraisals were apparently based to a great extent upon the conclusion that no right of recovery existed as a matter of law as to those portions of a tract which were outside the clearance easement area, rather than upon a finding of fact that there was no disturbance and accordingly no diminution of value in such portions of the tracts.
25. Actual sales of land in the vicinity of the Base which give some indication of market value and market conditions include:
(1) Spangler-Martin, NW and NE NE and S/2 NE Sec. 26-3N-20W, 280 acres, sold May 1957 for $21,000, or $75 per acre, unimproved. Tract adjoins the Turley and Ethridge tracts on the north. This land was purchased by the witness Mahan in 1950 for $50 per acre, who sold it in 1952 to Conder for $80 per acre, who sold it in 1953 to Spangler for approximately $80 per acre, who in turn sold it in 1957 to Martin for $75 per acre.
(2) Baucum-Johnson, SE Sec. 22-3N-20W, 160 acres, sold June 1956 for $11,000, or $68.50 per acre, with improvements of little value, and the land in very poor condition. Tract is a half mile north of the northwest corner of the Turley tract. The low selling price could have a relationship *505 to the poor condition of the improvements or to the jet operations.
(3) Wiggenham-Tims, NW See. 27-3N-20W, 160 acres, sold in 1954 for $22,500, or $140 per acre, with a fair set of improvements. Tract is located one-half mile west of the Turley tract. This sale, at $140 per acre, prior to jet operations, is comparable to the Biaucum-Johnson sale at $68.50 after jet operations.
(4) Price-Russell, N/2 SE Sec. 28-3N-20W, 80 acres, sold May 1956 for $10,000, or $125 per acre, unimproved. It is outside the area of any substantial jet interference, one and a quarter miles north and one and a half miles west of the north end of the runway. It is better land than either of the previous two sales, but sold at a much higher price, even though unimproved.
(5) Stewart-Marshall, NE Sec. 34-3N-20W, 160 acres, sold in February 1958 for $30,000 or $187.50 per acre. Tract is located one-half mile north and one-half mile west of the north end of the runway. It had good improvements, located midway along the north side. The improvements are almost one mile north and three-quarters of a mile west of the north end of the runway. The land is good, and the property was in good condition at the time of the sale.
(6) Holdridge-Price, SW Sec. 1-2N-20W, 160 acres, sold January 1952 for $82,000, or $200 per acre. Sale was prior to any flights of jet aircraft. It is better land than that to the north, and had good improvements.
(7) Ballinger-Walker, E/2 SE Sec. 2-2N-20W, 80 acres, sold in 1943 for $9,250, or $103 per acre, unimproved.
(8) Brown-Warren, part of NW Sec. 22-2N-20W, 69 acres, sold September 1956 for $250 per acre. This tract is located about one-half mile west of the Mock tract, outside the area of jet operations.
(9) Zeman-Lane, W/2 SE Sec. 33-3N-20W, 80 acres, sold in November 1951 for $12,000, or $150 per acre. Tract is about one and three-quarters miles west of the north end of the runway. The sale was prior to jet operations.
(10) Clontz-University Investment Co., 48 acres in Sec. 16-2N-20W, sold in January 1981 for $26,000, or $542 per acre. Tract is one and three-quarters miles west of the south *506 end of the runway, and is within the city limites of Altus. The tract is being developed for residential construction.
(11) Evans-Mills, S/2 SW SE Sec. 14-2N-20W, 20 acres, sold December 1957 for $2,000, or $100 per acre. Tract is directly north of Mock tract, between it and the Air Base, and subject to much interference from jet operations. Sale price reflects decrease in value which is considered to be primarily due to the several restrictive easements on the property.
(12) Mock-Leger Mill, 37.42 acres out of N/2 Sec. 23-2N-20W, sold for $35,000 in June 1959. This is part of the Mock tract involved in this action.
Land values vary considerably within the area, depending upon location, character of soil, proximity to the highway and to the City of Altus, and the nature and value of improvements. A specific and careful analysis and comparison must be made before it can be determined whether any particular sale is fairly comparable to others.
26. Defendant has taken a permanent easement of flight over each of the individual tracts remaining in this action. The easement is for flight of jet aircraft, and aircraft of other types, at altitudes below 500 feet, in taking off from and landing upon the runway at Altus Air Force Base. Plaintiffs, owners of the respective tracts, have received no compensation for the easement taken by defendant.
The process of taking commenced with the first flights of the large multijet bombers in 1955. The process of taking was complete, and the consequences thereof definite and measurable as to all tracts, by January 1, 1957..
27. It is found that the fair market value of the respective tracts here in suit has been decreased by virtue of the taking of an easement of flight in the amounts set out below:

Case No. S1-S9

Tract No. 1 (Mock)_$20,000
Tract No. 3 (Wilks)_ 5, 000

Case No. 349-59

Tract No. 1 (Ethridge)_ 4,000
Tract No. 2 (R. V. Hall and Myrtle L. Hall)_ 2,000
Tract No. 3 (Ida Hall)_ 3,500
Tract No. 4 (Turley)_ 3, 500
*507 CONCLUSION OF LAW
Upon tbe foregoing findings of fact, which are made a part of the judgments herein, the court concludes as a matter of law that in No. 31-59 plaintiffs Ealph H. Mock and Der-wood Wilks are entitled to recover, and it is adjudged and ordered that these plaintiffs recover of and from the United States the respective sums set forth in the schedule of compensation in finding 27, plus amounts computed at a rate of four (4) percent per annum from January 1, 1957, to date of payment, all as part of just compensation. The petition is dismissed as to plaintiffs Lola M. Morris and W. W. Williams (claims withdrawn) in No. 31-59. It is further concluded that all the plaintiffs in No. 349-59 are entitled to recover, and it is adjudged and ordered that these plaintiffs recover of and from the United States the respective sums set forth in the schedule of compensation in finding 27, plus amounts computed at a rate of four (4) percent per annum from January 1, 1957, to date of payment, all as part of just compensation.
It is further concluded that, as a condition of the judgments, defendant is vested with a permanent easement of flight, with airplanes of any character, over each of tracts 1 and 3 in No. 31-59 and tracts 1-4 (inclusive) of No. 349-59, at elevations equal to and above the glide angle plane. Plaintiffs will execute and deliver to defendant deeds describing and conveying the interests so taken.

 No. 31-59 originally involved four parcels, but plaintiffs Lola M. Morris and W. W. williams, tbe owners of tracts 2 and 4 in that case, have withdrawn their claims. The lands left in the two suits are tracts 1 and 3 in No. 31 — 50 and tracts 1-4 in No. 349-59. See findings 1 and 2.

 The determination that easements were taken is amply supported.

 A related argument of defendant’s Is that plaintiffs are entitled to recover only for the interference caused for the few seconds when the aircraft is directly over their land. Assuming this is so, there is no showing how that would affect the allowances made by the Commissioner. What is important is not so much the duration of noise and vibration for any single overflight, but the frequency and intensity of the disturbances over a period of time. Moreover, the owner of a small tract cannot be expected in his proof to differentiate sharply between the interference caused by a flight as it passes directly over his property and the interference attributable to the flight as it comes toward and leaves his land. If the defendant wishes this refined distinction, to be made, it should assume the burden.

 Evidence was admitted of interference with crop spraying over the Eth-ridge tract. Defendant objects to this. We do not think that this factor was reflected in the allowance of compensation.

 As In the Davis case, supra, defendant's expert based his appraisals to a great extent on the erroneous conclusion that, as a matter of law, plaintiffs were not entitled to recover for the portions of their property outside the clearance easement area. This error permeated his testimony.

 Plaintiffs have not excepted to the Commissioner’s findings and recommendations on this point; therefore, we are directing the deeds to refer to aircraft “of any hind” without deciding whether such a direction, would be made if a proper exception had been taken.

 The plaintiffs are: (1) Ralph H. Mock, (2) Lola M. Morris, (3) Derwood Wilks, and (4) W. W. Williams.

 The plaintiffs are: (1) Virgie Ethridge, (2) William T. Ethridge, (3) Ida A. Hall, (4) Myrtle L. Hall, (5) R. V. Hall, and (6) R. C. Turley.

 The specific elevations have been calculated by plotting the GCA flight path and lower safety limit on defendant’s exhibits 1 and 2. At 10,000 feet, the GCA is 437 feet above runway elevation ^ Tan 2.5 ~^qqqq) an<J at 5,000 feet it is 218.5 feet. At 10,000 feet, the lower safety limit is 350 feet, and at 5,000 feet 175 feet. The lines on defendant’s exhibits 1 and 2 purporting to depict the GCA flight path appear to be in error by starting at the wrong point and rising at the wrong angle. They are different for the two different cases over the same terrain. After plotting the angles correctly, the height was measured as to the closest edge of each tract. The GCA flight path is 300 feet above the ground' at two nautical miles (12,120 feet) from touchdown and the lower safety limit 250 feet at the point.

 Limited visual and oral radio aid (see Tr. 448).