**Claude A. NUNNALLY, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 7308.**

United States Court of Appeals Fourth Circuit.

Argued Nov. 28, 1956.

Decided Dec. 26, 1956.

---

**522**

George R. Humrickhouse and Robert N. Pollard, Jr., Richmond, Va. (C. O'Conor Goolrick, Fredericksburg, Va., on the brief), for appellant.

A. Donald Mileur, Atty., Dept. of Justice, Washington, D. C. (Perry W. Morton, Asst. Atty. Gen., Lester S. Parsons, Jr., U. S. Atty., Norfolk, Va., Edwin J. Slipek, Asst. U. S. Atty., Richmond, Va., and Roger P. Marquis, Atty., Dept. of Justice, Washington, D. C., on the brief), for appellee.

Before PARKER, Chief Judge, SOBELOFF, Circuit Judge, and THOMSEN, District Judge.

THOMSEN, District Judge.

Plaintiff's appeal in this action under the Tucker Act, 28 U.S.C.A. § 1346(a)(2), raises the question whether his property or any interest therein has been taken by the United States within the meaning of the Fifth Amendment. The complaint also alleged a claim under the Federal Tort Claims Act, 28 U.S.C.A. § 1346(b), but plaintiff concedes that he proved no case under that act.

The United States established the Dahlgren Naval Proving Ground at Dahlgren, Virginia, in 1918. Since that time sixteen-inch naval guns and many other types of ordnance have been tested there.

In 1939 plaintiff and another physician, Dr. N. Talley Ballou, purchased Wood Island, which has an area of about one acre, and is located in Machodoc Creek about 2,300 yards from the then boundaries of the Proving Ground. They built a house and other improvements on the island, and used it for recreational purposes.

In 1944 the United States acquired by condemnation, as an addition to the Proving Ground, 1,641 acres in the area known as Tetotum Flats or Pumpkin Neck, located on the south shore of Machodoc Creek, about 800 feet from Wood Island.

Since November, 1945, the United States has conducted two types of tests on Pumpkin Neck: aircraft drops and fragmentation tests. Aircraft drops are made to learn how a weapon behaves in falling and striking the ground; most of those tests are made with weapons that do not contain explosives. In fragmentation tests the weapon is placed inside a circular arena made of steel plates, lined with boxes of sawdust or fiber-

board, which trap the fragmented pieces; their purpose is to learn where the parts of an ordnance item go when it explodes.

There are two main testing areas on Pumpkin Neck: the octagon target, approximately 3,000 feet from Wood Island, and the pyramid target, approximately 7,000 feet from the island and from main administration buildings on the Proving Ground. A third area, known as the Howland Point area, about 2,000 feet from the island, was used in September and October, 1955, for ground detonations. Pumpkin Neck is not used as a bombing range.

The government's records show that over a 4½ year period, 1950 to 1955, aircraft drops were made on 73 days, on only nine of which explosives were used. The great majority of the explosive items contained only one pound of black powder, six contained three pounds, eight contained four pounds, five contained twelve pounds, and ten contained 125 pounds of explosives. Ninety-three percent of the drops were made on the pyramid (far) target. All were controlled drops made by aircraft using predetermined courses. None of the courses passed over Wood Island; but on a few occasions the aircraft failed to fly on the prescribed course, and flew over the island. On all but nine of the flights the lowest altitude reached by the airplane was at least 2,000 feet. A few came over at treetop height. Fragmentation tests during a 6½ year period, 1949 to 1955, were made on 399 days, but few of the items contained more than 250 pounds of explosives. The intensity with which Pumpkin Neck is used for fragmentation tests is not increasing. The largest charge ever exploded there, 1,800 pounds, was set off in 1946. No tests were made on Sundays or at nights.

In August, 1946, about nine months after the tests began on Pumpkin Neck, plaintiff purchased Dr. Ballou's half interest in the island. Thereafter plaintiff made additional improvements to the house and to the land. He continued to use the island for vacations, for weekends, and for an occasional afternoon visit in the middle of the week, until 1950, when he purchased a new vacation spot nearer his home.

Plaintiff's property on Wood Island has not been physically damaged as a result of the activities on Pumpkin Neck. Some of the ceiling panels in the house have fallen but it was not proved that they fell as a result of concussion rather than dampness or some other reason. Three years after plaintiff stopped using the property, the glass in the windows was still intact.

The pyramid target is no nearer Wood Island than it is to the office buildings on the base, and to the residential quarters for officers and their families. A camp for Boy Scouts is located on Pumpkin Neck itself, only slightly farther than Wood Island from the octagon target. Both the camp and the island are outside the designated danger areas. Plaintiff admits that no fragments have ever fallen on the island. There is evidence that one fragment fell into the water between the island and Pumpkin Neck, and that one fragment was found in the ground on a neighboring property, but how and when it got there nobody knows. Plaintiff is not afraid to live on the island; but he testified that the purpose for which he acquired it "had simply gone; * * * with the bombings and the detonations and the planes, it was simply not a relaxing place to go." The district judge found that as a result of the activities on Pumpkin Neck, plaintiff's property has lessened in value approximately $1,500; but, since he found that there had been no taking he entered judgment in favor of the defendant.

Plaintiff admits that he must show a physical invasion of his property before he can recover in this case. He claims that the government has invaded or exercised dominion over his property in two ways: by the noise and shock of test explosions, and by the flights of aircraft over the island.

The rule, that "acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though their consequences may im-

pair its use, are universally held not to be a taking within the meaning of the constitutional provision", was stated by the Supreme Court in Transportation Co. v. Chicago, 99 U.S. 635, 25 L.Ed. 336. It has been restated in similar terms many times since, e. g. "The Constitution provides that private property shall not be taken without just compensation, but a distinction has been made between damage and taking, and that distinction must be observed in applying the constitutional provision." Bedford v. United States, 192 U.S. 217, 224, 24 S.Ct. 238, 240, 48 L.Ed. 414.

"Flights over private land are not a taking, unless they are so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land." United States v. Causby, 328 U.S. 256, 266, 66 S.Ct. 1062, 1068, 90 L.Ed. 1206. There is no evidence of frequent, low flights in this case.

■ The instant case is clearly distinguishable from Portsmouth Harbor Land & Hotel Co. v. U. S., 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287, upon which plaintiff principally relies. The claimants in that case filed a petition alleging that the government had set up heavy coast defense guns, with the intention of firing them over the land of the claimants and without the intent or ability to fire them in any other manner. They also alleged that the government had established a fire control station and service, and thereafter discharged the guns over and across their land. The damages alleged in that case were not consequential; they were the product of a direct invasion of claimants' domain. But damages which are the incidental result of lawful governmental action, without any direct invasion of private property, are consequential; they do not constitute a taking under the Fifth Amendment.

Plaintiff has suffered no peculiar damage. His annoyance is of the same type to which everyone living in the vicinity is subjected in varying degrees. There is, at most, a "sharing in the common burden of incidental damages". Richards v. Washington Terminal Co., 233

U.S. 546, 554, 34 S.Ct. 654, 657, 58 L.Ed. 1088. If it should be held that the facts in the present case constitute a taking, any reduction in the value of property attributable to a federal activity might be urged as a valid claim against the United States. The distinction between a "damage" and a "taking", so carefully preserved by the courts, would be obliterated.

■ Whatever the future may bring, there has not yet been a taking of the plaintiff's property, or of any interest therein, within the meaning of the Fifth Amendment.

Affirmed.