William J. BATTEN and Katie M. Batten, his wife; Donald G. Becker and Opal M. Becker, his wife; Don T. Campbell and Leta Mae Campbell, his wife; Ernest S. Horton and Margaret U. A. Horton, his wife; Ivan F. Huhs and Bernadine M. Huhs, his wife; Thomas N. Lee and Gladys M. Lee, his wife; Clyde A. Lewis and Dorothy L. Lewis, his wife; Edward Dale Moore and Fay L. Moore, his wife; John W. Stephens and Vada Stephens, his wife; and Ralph C. Weed and Mary T. Weed, his wife, Appellants,

v.

UNITED STATES of America, Appellee.

No. 6906.

United States Court of Appeals Tenth Circuit.

July 10, 1962.

Rehearing Denied Aug. 9, 1962.

See also 292 F.2d 144.

Roger P. Marquis, Attorney, Department of Justice (Ramsey Clark, Asst. Atty. Gen., Newell A. George, U. S. Atty., and R. Stanley Ditus, Asst. U. S. Atty., on the brief), for appellee.

Harvey D. Ashworth and Raymond L. Spring, Topeka, Kan. (A. Harry Crane, Ward D. Martin, Arthur L. Claussen and Jack C. McCarter, Topeka, Kan., on the brief), for appellants.

Before MURRAH, Chief Judge, and LEWIS and BREITENSTEIN, Circuit Judges.

BREITENSTEIN, Circuit Judge.

This case presents the novel question whether a taking of property, compensable under the Fifth Amendment, occurs when there is no physical invasion of the affected property but the operation and maintenance of military jet aircraft on an Air Force Base of the United States produce noise, vibration, and smoke which interfere with the use and enjoyment of the property. The appellants-plaintiffs, owners of 10 homes at Pauline, Kansas, sued the United States under the Tucker Act [1] and base their claims on the use of jet aircraft at Forbes Air Force Base which adjoins the subdivision in which they live. They acquired their homes prior to the enlargement of the Base to accommodate jets. Recovery was denied on the ground that there was no taking of property in violation of the Fifth Amendment for which the United States was liable under the Tucker Act.[2]

The facts are not disputed. Forbes Air Force Base, originally known as Topeka Army Air Field, was a temporary World War II base used for training in the operation of propeller-driven aircraft. It was deactivated at an undisclosed date prior to 1948. In that year a tract, the southeastern corner of which adjoined the northwestern corner of the Base, was platted as a residential subdivision. The homes of the plaintiffs were built and acquired in the period 1949–1955. After the Korean War started the United States obtained land adjacent to the subdivision on the east to enlarge the Base for the accommodation of jet aircraft. Use of a lengthened runway, known as 13–31, began in September, 1955, and a

1. 28 U.S.C. § 1346(a) (2). The United States District Court had jurisdiction because each claim was for less than $10,000.

2. The Tucker Act provides, 28 U.S.C. § 1346(a) (2) that an action may be maintained against the United States for a claim "founded * * * upon the Constitution, * * * or upon any express or implied contract with the United States." The last clause of the Fifth Amendment reads: "nor shall private property be taken for public use, without just compensation."

ramp, parking area, and warm-up pad for jet planes were put into operation in the spring of 1956.

Since the enlargement of the Base, about 100 RB–47 and B–47 six-engine jet aircraft and about 40 KC–97 six-engine propeller-driven aircraft have been located there. Aircraft movements average about 4,000 monthly or about 130 daily and of these 70% are attributable to jets. This activity occurs usually between dawn and dusk, Monday through Friday, but occasionally on the week ends and at night.

The plaintiffs do not rely on flights over their properties to sustain their claims. The trial court found:

"The Pauline Subdivision is outside the flying pattern of all aircraft operating from Forbes Air Force Base, and the Government does not claim or exercise any right to fly any planes over plaintiffs' property. However, on a few occasions, RB–47 and B–47 jet aircraft did fly directly over the plaintiffs' homes in Pauline, Kansas, Subdivision at low altitudes."

The jets use the 13–31 runway almost exclusively. The operating procedure is for the engines to be started on the parking ramp about 30 minutes before take-off. The ramp is 900 feet wide and at its nearest point is 650 feet from any property of the plaintiffs. After about 10 minutes the plane is taxied to the warm-up pad, located 2,000 feet from the nearest property of the plaintiffs, where final pre-flight checks are performed. During this period all 6 engines are running at idling speed. The plane is then moved to the take-off point. About one-half of the flights begin at the end of the 13–31 runway near Pauline and at a point 2,280 feet from the nearest property of the plaintiffs. About 30 seconds before take-off the engine power is advanced to maximum output. The planes are airborne some 50 seconds after start.

From April through October a water-alcohol injection system is used to increase the maximum power by 23%. The RB–47 and B–47 jets leave a character-

istic trail of black smoke which is increased by the use of the water-alcohol injection system and which is quite heavy for about 70 seconds after the brakes have been released for take-off but which is exhausted within a mile from the end of the runway.

Maintenance work on the planes was done on the ramp 3,420 feet from the nearest property of the plaintiffs until May, 1960, when it was moved to a location about 1½ miles therefrom. In the maintenance operations jet engines are run at power settings of from 50% to 100%. During a typical month the engines were operated for 84 hours in the 100% RPM range and for 211 hours in less than that range for maintenance purposes.

Ground power generators are used on the parking ramp to provide auxiliary power to start the jet engines and to recharge the batteries of the planes. From 4 to 10 of these generators may operate at the same time and on occasion they run from 8 to 10 hours at any time during the day and sometimes at night.

The mentioned activities produce sound and shock waves which cross the plaintiffs' properties and limit the use and enjoyment thereof. Strong vibrations cause windows and dishes to rattle. Loud noises frequently make conversation and the use of the telephone, radio, and television facilities impossible and also interrupt sleep. During engine operation in the 100% range the sound pressure level measured in decibels varies from 90 to 117 decibels on the plaintiffs' properties. Ear plugs are recommended for Air Force personnel when the sound pressure level reaches 85 decibels and are required at or above 95 decibels.

In the summer months when there is an easterly wind, the black smoke developed during jet take-offs occasionally blows across the plaintiffs' properties leaving an oily black deposit on the houses and laundry of the plaintiffs.

The court found that:

" * * * plaintiffs have suffered a substantial interference of the use

and enjoyment of their properties, which interference did not exist prior to the construction and activation of the new runway in September, 1955, and the new ramp in March or April, 1956."

The court further found that such interference "is of the same character as that noticed in varying degrees in the general area surrounding the Base" with greater adverse effect on the plaintiffs because of the proximity of their property to the Base.

Diminution in value of the 10 homes was found in amounts which varied from $4,700 to $8,800.[3] The trial court deemed United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206, to be a controlling precedent and held that there was no taking of an interest in the plaintiffs' properties for which compensation had to be paid.

The case at bar is one of first impression in the federal appellate courts and presents an issue of widespread current interest. The jet airplane is a great boon to the traveler but a veritable plague to the homeowners near an airfield. The noise, vibration, and smoke incidental to the operation and maintenance of jet planes disturb the peace and quiet in every residential area located near an airport used by the jets. This disturbance is felt not only by those whose property is crossed by the planes on take-offs or landings but also by those who live outside of the established flight patterns. The Supreme Court has allowed recovery under the Tucker Act to a landowner whose property was crossed by low-elevation flights of military planes on take-offs and landings.[4] The novelty in the instant case is that liability is asserted not because of disturbance in conjunction with any over-flights but because of the noise, vibration, and smoke alone which harass the occupants of nearby proper-

ties. The amount of harassment varies with the proximity of the property to the scene of jet operations.

No amount of sympathy for the vexed landowners can change the legal principles applicable to their claims. We do not have either a tort or a nuisance case. The plaintiffs sue under the Tucker Act and whether the applicability of that Act depends on a taking without compensation in violation of the Fifth Amendment or on an implied promise to pay for property taken, the claims are founded on the prohibition of the Fifth Amendment, "nor shall private property be taken for public use, without just compensation."[5]

In construing and applying this constitutional provision the federal courts have long and consistently recognized the distinction between a taking and consequential damages. In Transportation Company v. Chicago, 99 U.S. 635, 642, 25 L.Ed. 336, the Supreme Court held that governmental activities which do not directly encroach on private property are not a taking within the meaning of the Fifth Amendment even though the consequences of such acts may impair the use of the property. The principle was repeated in United States v. Willow River Power Co., 324 U.S. 499, 510, 65 S.Ct. 761, 89 L.Ed. 1101, the Court saying that "damage alone gives courts no power to require compensation." We have recognized the rule in this circuit by our holding in Harris v. United States, 10 Cir., 205 F.2d 765, 767, that under the federal constitution "damages to property not taken are compensable only as a consequence of or incidental to an actual taking."

Because of this rule which denies the recovery of consequential damages in the absence of any taking, many state constitutions provide in substance that private property shall not be taken or damaged

---

3. Stated in terms of percentages the diminution in value ranged from 55.3% to 40.8%.

4. United States v. Causby, supra. See also Griggs v. Allegheny County, 369 U.S. 84 82 S.Ct. 531, 7 L.Ed.2d 585.

5. United States v. Dickinson, 331 U.S. 745, 748, 67 S.Ct. 1382, 91 L.Ed. 1789.

for public use without compensation.[6] However, the federal obligation has not been so enlarged either by statute or by constitutional amendment.

In Causby the Supreme Court held that the continuous invasions of the airspace superadjacent to the property of the landowner by military planes taking off and landing at a nearby base was "in the same category as invasions of the surface" and that the damages were not "merely consequential" but "the product of a direct invasion of respondent's domain."[7] The plaintiffs argue that the actual damage in Causby resulted from noise and vibrations and that if recovery is permitted for sound and shock waves traveling vertically, it should also be allowed for such waves traveling laterally. The unacceptability of this theory was demonstrated in Nunnally v. United States, 4 Cir., 239 F.2d 521, where recovery was denied because of diminution in value of a recreational cottage by practice bombing on an adjoining federal proving ground. The Fourth Circuit pointed out that there was no physical invasion of the plaintiff's property and that there was at the most a "sharing in the common burden of incidental damages" because the annoyance was the same as that to which everyone living in the vicinity was subject to varying degrees. The court said that to permit recovery would be to obliterate the carefully preserved distinction between "damage" and "taking."

We are cited to no decisions holding that the United States is liable for noise, vibration, or smoke without a physical invasion. In Causby, Griggs, and a number of lower court decisions such as Highland Park, Inc. v. United States, 161 F.Supp. 597, 142 Ct.Cl. 269; Herring v. United States, 162 F.Supp. 769, 142 Ct.Cl. 695, and Matson v. United States, 171 F. Supp. 283, 145 Ct.Cl. 225, there were regular flights over the property. Absent such physical invasion recovery has been uniformly denied.[8]

Plaintiffs cite no cases with either facts or issues analogous to those with which we are concerned. Richards v. Washington Terminal Company, supra, allowed recovery because smoke and fumes were driven out of a tunnel by an exhaust fan in such manner that they were directed across plaintiff's property, but in so doing expressly recognized the invasion principle. United States v. Cress, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746, and United States v. Kansas City Life Insurance Co., 339 U.S. 799, 70 S.Ct. 885, 94 L.Ed. 1277, cases of flooding and underflooding respectively, applied the same principle. Swetland v. Curtiss Airports Corporation, 6 Cir., 55 F.2d 201, 83 A.L.R. 319, was an action to enjoin a private nuisance and the decision rests on the theory of balance of conveniences.

In Armstrong v. United States, 364 U.S. 40, 48, 80 S.Ct. 1563, 4 L.Ed.2d 1554, the Court held that the total destruction of a lien was a compensable taking. Baltimore & Potomac Railroad Company v. Fifth Baptist Church, 108 U.S. 317, 332, 2 S.Ct. 719, 27 L.Ed. 739, sustained a recovery by a church for a nuisance created by a railroad operating in the District of Columbia under congressional authorization and the Court expressed doubt that such authorization would justify total deprivation of use without compensation. In discussing the mean-

---

6. Richards v. Washington Terminal Company, 233 U.S. 546, 554, 34 S.Ct. 654, 58 L.Ed. 1088. In 2 Nichols on Eminent Domain (3d ed. 1950) § 6.44, pp. 324–325, there is a list of 25 states whose constitutions so provide. Interestingly every state within the Tenth Circuit, except Kansas, has so provided.

7. 328 U.S. 265, 66 S.Ct. 1068.

8. See Freeman v. United States, D.C.W.D. Okl., 167 F.Supp. 541, wherein the flights were alongside the plaintiff's land. In

Pope v. United States, D.C.N.D.Tex., 173 F.Supp. 36, the complaint was based on the operation of an engine test cell by the Air Force and it was held that there was no taking because the test cell did not encroach on the plaintiff's land. Nuclear detonations by the Atomic Energy Commission at a site removed from the plaintiff's property was held not to be a taking in Bartholomae Corporation v. United States, 9 Cir., 253 F.2d 716, 718, 73 A.L.R.2d 1293, note 2.

ing of the word "taken," the Court said in United States v. General Motors Corp., 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311, that governmental action short of occupancy was a taking "if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter."[9]

In the instant case there is no total destruction and no deprivation of "all or most" of the plaintiffs' interests. The plaintiffs do not suggest that any home has been made uninhabitable or that any plaintiff has moved because of the activities at the Base. The record shows nothing more than an interference with use and enjoyment.

Congress has placed the navigable airspace in the public domain and has authorized administrative regulation of minimum altitudes of flight.[10] The regulations so far as pertinent fix the minimum altitudes at 1,000 feet over congested areas and 500 over sparsely populated areas.[11] The airspace below such minimums is within the dominion of the landowner. The over-flights considered in Causby invaded that dominion. In the situation confronting us the warm-ups occur 2,000 feet, the take-offs 2,280 feet, and the maintenance 1½ miles from the nearest property of the plaintiffs. Causby contains nothing indicating that recovery could be had for noise, vibration, or smoke coming from the same vertical distances.

Each of these disturbing conditions is brought to the plaintiffs' properties through the air and they do not effect an actual displacement of a landowner from space within which he is entitled to exercise dominion consistent with recognized concepts of real property rights. Such displacement is a fact when occasioned by repeated airplane flights. Sound waves, shock waves, and smoke pervade property neighboring that on which they have their source but the disturbance caused

thereby is only a neighborhood inconvenience unless they are intentionally directed to some particular property as was the case in Richards v. Washington Terminal Co., supra, or unless they force the abdication of the use of space within the landowner's dominion. The activities of which the plaintiffs complain are not directed against them or their property and do not arrogate to the government any of the plaintiffs' dominion over their properties. The situation is common to that found on all the private property surrounding the Base.

The vibrations which cause the windows and dishes to rattle, the smoke which blows into the homes during the summer months when the wind is from the east, and the noise which interrupts ordinary home activities do interfere with the use and enjoyment by the plaintiffs of their properties. Such interference is not a taking. The damages are no more than a consequence of the operations of the Base and as said in United States v. Willow River Power Co., supra, they "may be compensated by legislative authority, not by force of the Constitution alone." As we see the case at bar, the distinctions which the Supreme Court has consistently made between "damages" and "taking" control and compel denial of recovery.

Affirmed.

MURRAH, Chief Judge (dissenting).

It is agreed that subsequent to the establishment of the homes of these plaintiffs, the Government constructed these runways and warm-up pads nearby, for Jet Engine operation, and that, as a direct result of this operation, the "plaintiffs have suffered a substantial interference of the use and enjoyment of their properties * * *," with consequent substantial diminution of the values of such properties. It seems also agreed that the right asserted, i. e., the peaceful

9. Cf. United States v. Dickinson, supra, where the Court said: "Property is taken in the constitutional sense when inroads are made upon an owner's use of it to an extent that, as between private

parties, a servitude has been acquired either by agreement or in course of time."

10. 49 U.S.C. §§ 1301(24) and 1348(a).

11. 14 C.F.R. § 60.17.

enjoyment of their homes, is a constitutionally protected property right, and that the admitted injury to such right is peculiar to these plaintiffs, who are similarly situated. In any event, "the constitutional provision is addressed to every sort of interest the citizen may possess," (see United States v. General Motors, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311) and certainly includes the right to the peaceful possession of residential property. The economic interest asserted here, is no different from that "taken" in Causby and Griggs.

Both the trial Court and this Court have denied compensation, upon the premise that an actual physical invasion of the property damaged is a sine qua non to a constitutional taking, and the injury is, therefore, merely consequential; hence, not constitutionally compensable. It is my thesis that a constitutional taking does not necessarily depend on whether the Government physically invaded the property damaged.

It is true that, in the very nature of things, most constitutional takings are accompanied by actual physical invasion. See Transportation Company v. Chicago, 99 U.S. 635, 25 L.Ed. 336; Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322; Portsmouth Harbor Land & Hotel Company et al. v. United States, 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287; United States v. General Motors, supra; United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206; United States v. Dickinson, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789; United States v. Kansas City Life Insurance Co., 339 U.S. 799, 70 S.Ct. 885, 94 L.Ed. 1277; Griggs v. Allegheny County, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed. 2d 585; and, Nunnally v. United States, 4 Cir., 239 F.2d 521. But, the Government may surely accomplish by indirect interference, the equivalent of an outright physical invasion. "If regulation goes too far it will be recognized as a taking." Pennsylvania Coal Co. v. Mahon, supra, 260 U.S. p. 415, 43 S. Ct. p. 160. Thus, a "taking" was effected in Armstrong v. United States,

364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554, by the destruction of the liens on property through governmental acquisition of title. The closing of a gold mine, by force of a wartime governmental regulation, without physical invasion was held not to be a constitutional taking in United States v. Central Eureka Mining Co., 357 U.S. 155, 78 S.Ct. 1097, 2 L.Ed.2d 1228, but not without recognizing that "action in the form of regulation can so diminish the value of property as to constitute a taking." There was forceful argument in dissent to the effect that to make the property owner's right to compensation turn on the physical act of taking, was to "permit technicalities of form to dictate consequences of substance." (See Mr. Justice Harlan's dissent, p. 181, 78 S.Ct. p. 1110.) It is admitted that the compensable damage in Richards v. Washington Terminal, 233 U.S. 546, 34 S.Ct. 654, 58 L.Ed. 1088, was not accompanied by an actual invasion, though the case is said to have been decided on the invasion theory. The facts and reasoning there are analogous to our situation, and serve to prove the recognition of a constitutional taking by indirect interference. The principal is analogous to trespass and nuisance. See cases collected in Harvard Law Review, June 1961 p. 1581.

As I view the precedents, especially in the context of their contrariety, the decisional process involves an analysis and evaluation of competing interests, i. e., the public versus private, within the framework of our social order—a jurisprudence of interest, if you please, in which the State imposes its will, subject only to the constitutional covenant that it will pay "just compensation" for "private property" which is "taken." The critical and definitive words are, to be sure, constitutional language which, as we know, are subject to formulations, depending upon a point of view. We start with the agreed proposition that not every governmental interference, which adversely affects a private economic interest, amounts to a constitutional taking. See United States v. Willow River Power Co., 324

U.S. 499, 65 S.Ct. 761, 89 L.Ed. 1101; Armstrong v. United States, supra; and, Nunnally v. United States, supra. "Frustration and appropriation are essentially different things." Omnia Company v. United States, 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773. As I reason, the constitutional test in each case is first, whether the asserted interest is one which the law will protect; if so, whether the interference is sufficiently direct, sufficiently peculiar, and of sufficient magnitude to cause us to conclude that fairness and justice, as between the State and the citizen, requires the burden imposed to be borne by the public and not by the individual alone.

Indeed, my brothers impliedly embrace this theory when they indicate that if the governmental interference in this case had rendered the plaintiffs' homes totally uninhabitable, the damages would have been compensable, as for a constitutional taking. But, they then say, that since there is "nothing more than an interference with use and enjoyment" of the property, the admitted damages are merely "consequential." This leaves me in doubt as to whether compensation is denied because the interest asserted is not one which the law will protect, as in United States v. Willow River Power Co., supra, or whether the interference with a protectable property right was not sufficiently direct, peculiar and grave to justify a conclusion of "taking." If the decision is based on the latter premise, I must inquire at what point the interference rises to the dignity of a "taking?" Is it when the window glass rattles, or when it falls out; when the smoke suffocates the inhabitants, or merely makes them cough; when the noise makes family conversation difficult, or when it stifles it entirely? In other words, does the "taking" occur when the property interest is totally destroyed, or when it is substantially diminished?

My point of view leads me to conclude, contrary to my brothers, that the interference shown here was sufficiently substantial, direct and peculiar to impose a servitude on the plaintiffs' homes, quite as effectively as the over-flights in Causby and Griggs, and the smoke and gases in Richards. I would, therefore, hold the damages constitutionally compensable.