Grace E. AVERY et al.
v.
The UNITED STATES.
No. 192–60.

United States Court of Claims.
April 17, 1964.

DURFEE, Judge.

This is an action seeking compensation for the taking by defendant of avigation easements over 33 parcels of land located in Seminole County, Florida, near, and west of the United States Naval Air Station at Sanford. Generally, the area in which the parcels are located can be described as suburban in character made up of unimproved lots, single family residences, some multi-family units, schools, stores and other establishments designed to serve an average suburban community.

The Naval Air Station, a World War II installation that was deactivated in 1946, was reactivated in May of 1951. Its east-west runway, Runway 9–27, was lengthened from its original 6,000-foot length to 8,000 feet in 1953. In 1957 and 1959 paved "overruns" were added, bringing the total length of the runway to 11,450 feet at the time this suit was filed.[1] A wall 15 feet high and 600 feet in length was installed at the extreme western edge of the runway as a shield from the blast of jet aircraft preparing to take off to the east.

Initially, upon reactivation, the Station was stocked with jet fighter planes. In 1953, the Station's mission was changed and a heavier type of aircraft, the AJ "Savage," equipped with one turbojet and two reciprocating engines, was brought to the station. In January 1957 the Navy's then largest long-range bomber, the Douglas A3D "Sky Warrior," arrived at the Station. Since a part of the Station's mission was the familiarization of Navy pilots with takeoff and landing techniques for new aircraft, a marked increase in the number of takeoffs and landings was experienced. The increase is charted in finding 7. For convenience, the parcels of land here involved have been grouped in five classifications. Since there is some variation in the

Wofford H. Stidham, Bartow, Fla., for plaintiffs. Warren E. Hall, Jr., Bartow, Fla., and Kenneth G. Spaulding, Sanford, Fla., of counsel.

Herbert Pittle, Washington, D. C., with whom was Asst. Atty. Gen. Ramsey Clark, for defendant.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

---

1. Overrun areas are used only for the commencement of takeoff runs by heavy aircraft. They also can be used on emergency runouts during aborted take-offs. The overrun areas were added to the *western* end of Runway 9–27 bringing the end of the runway within 200 feet of the outer perimeter of the Air Station. The runway usable for west-east landings commenced at the "threshold" 2,150 feet from the western edge of the Station.

claims presented by each group, we will discuss each in turn.

Group A, made up of parcels 1 through 12, and 14 through 18, located within the approach zone of the runway, were subjected to an avigation easement in 1953. In United States of America v. 143 Acres of Land, etc., Case No. 627 in the United States District Court, Southern District of Florida, the United States received a perpetual easement for the flight of aircraft over the parcels of Group A involved in the present case at elevations as low as 29 feet above the ground. Despite this existing easement, plaintiffs contend that the introduction of the larger, noisier A3D aircraft in January of 1957 constituted a further taking—an uncompensated expansion of the existing easement. The use of the new aircraft did further reduce the value of the lands. The question squarely before us then is whether the introduction of larger, heavier, noisier aircraft can constitute a fifth amendment taking of an *additional* easement *even though* new aircraft do not violate the boundaries of the initial easement.

In Klein v. United States, 152 Ct.Cl. 221 (1961), cert. denied 366 U.S. 936, 81 S.Ct. 1661, 6 L.Ed.2d 847, on a motion for reconsideration, this court reversed its earlier conclusion that plaintiff was barred by the statute of limitations since suit had not been instituted within six years of the date of initial taking. Relying on United States v. Dickinson, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947), we came to the conclusion that the cause of action did not accrue until the "extent of the taking of an easement of flight has been ascertained." Consequently, though there had been a taking as early as 1947, the ultimate taking could not be ascertained until 1954 when, through the introduction of new approach procedures and increased operations, "conditions became unbearable." It was not until then that the cause of action accrued and the statute started running.

■ Davis v. United States, 295 F.2d 931, 155 Ct.Cl. 418 (1961), also a statute of limitations case, more closely parallels the situation we face here since the question there involved the use of larger, noisier aircraft. In that case, B-52 bombers had supplanted B-36 type aircraft. The court, rejecting the statute of limitations defense, pointed out that:

> " * * * even if it could be said that a taking occurred in November 1951 when the B-36 bombers commenced flying over plaintiffs' land, it certainly was at most only a partial taking and *not such a taking* as occurred when the B-52 flights commenced. * * * " [295 F.2d at 933, 155 Ct.Cl. at 421, emphasis added]

Both decisions are based on the concept underlying United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946) that a land owner should be compensated for damage to his land values incurred through the taking of an easement under the fifth amendment.

Defendant would concede that the change in aircraft operations was sufficient to constitute the taking of a new and more extensive avigation easement over Group A by virtue of Klein, supra, and Bacon v. United States, 155 Ct.Cl. 441, 295 F.2d 936 (1961), but for the fact that the 1953 condemnation proceedings vested in the United States

> " * * * a perpetual easement and right of way for the free and unobstructed passage of aircraft in, through and over * * * "

the lands of Group A. Consequently, defendant argues as a matter of law, there could have been no further diminution of the land value since:

> " * * * the consequences of that fact insofar as the real estate market is concerned, were to diminish the fair market value and warn the world that any prospective purchaser of those properties would obtain a parcel which would be subject to noise, annoyance and serious interference with its use and enjoyment."

■■ The critical point of defendant's argument is based upon the prior

taking of a perpetual easement for all aircraft which puts the potential buyer on notice thereof. Though no case has yet directly examined and passed on the import of language in easements purporting to vest in the United States a right to fly aircraft, all aircraft, or aircraft of any kind, over tracts of land, we cannot conclude that there can never be a further taking and further damages as a matter of law due simply to such easements. Since the measure of damages is "the owner's loss, not the taker's gain," Causby, supra; United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1942), a subsequent loss in property value may be an essential factor in determination of a *subsequent* taking. Read in such a context, the words "passage of aircraft" as used in the easement taken in this case would necessarily be limited to types of aircraft, the operation of which would not constitute a *subsequent* taking.[2]

■■ Other factors that may be of aid in ascertaining when a further taking has occurred have already been outlined by this court. Increased operations, Klein, supra, or the introduction of new aircraft, Davis, supra, either or both of which results in greater noise, greater inconvenience and a further reduction of land values are but two of such factors. All these factors were here present. New aircraft were introduced; operations were increased and land values decreased sharply. We hold that a new and further taking occurred in 1957 as to the parcels in Group A and parcel 32 in Group B.

Group B, made up of parcels 23, 25 and 32, while located within the confines of the traffic pattern described in finding 9, is not (with the exception of parcel 32)[3] located within the approach zone to the western end of Runway 9–27. While the other Group B parcels (parcels 23 and 25) suffer from the same general effects of overflights as do the parcels of · Group A, they are not subject to takeoff and landing operations occurring directly overhead; both parcels being at least 17,000 feet south of the center line of the runway.

■ Aside from rare emergency situations, there were no flights directly overhead at less than 500-foot altitude over these parcels. Consequently, under the law as it is now enacted[4] and construed, there is no compensable taking of easement on these parcels,—the inconvenience and injury to the property being "incidental" and "unavoidably attendant" to the use of the airways. Aaron et al. v. United States, Ct.Cl., 311 F.2d 798; Matson v. United States, 171 F.Supp. 283, 145 Ct.Cl. 225 (1959); Richards v. Washington Terminal Co., 233 U.S. 546, 555, 34 S.Ct. 654, 58 L.Ed. 1088 (1914); Campbell v. United States, 266 U.S. 368, 45 S.Ct. 115, 69 L.Ed. 328 (1924).

The owners of Groups C, D and E advance a somewhat different argument than that already discussed. While there are concededly no frequent and low flights of aircraft over these properties, plaintiffs allege that a fifth amendment taking has occurred through the physical invasion of their property by sound waves. The interference with the en-

2. Our conclusion in this case that the condemned easement was limited to the use of aircraft not constituting a further taking is aided by the order entered by the District Judge on May 27, 1959 which opined that:
 * * * the proceedings in the instant case will in no wise affect the right of the defendants to proceed before the Court of Claims of the United States for damages, if any they have suffered by virtue of the activities of the plaintiff *since the Declaration of Taking in this case:*

* * * [Emphasis added, see finding 8 for complete order]

3. Parcel 32 is only distinguishable from the parcels of Group A in that it was not subject to any easement through the 1953 condemnation action. Defendant concedes that an easement over parcel 32 was taken.

4. The Federal Aviation Program of 1958, 49 U.S.C. §§ 1301(24) and 1348(a). Pertinent regulations are found in 14 C.F.R. § 60.17.

644

joyment of property is identical in nature and consequences to that suffered by Group A owners through the overflights.

Group C, two parcels improved by single family frame houses, is located within the traffic pattern but outside the approach zone, being situated some 3,000 to 3,500 feet south of the center line of the extended runway. Group D, parcel 24, an unimproved lot, is situated similarly to, but approximately 1,000 feet west of Group C. Group E, parcels 40 through 46, are located outside the traffic pattern, but are contiguous to the northwest corner of the Station.

The alleged taking occurred in March of 1959 when defendant placed in operation the western overrun extensions. In preparing for takeoff to the east, the pilot taxis to the extreme end of the overrun portion, turns the aircraft to takeoff position heading east, then, while holding the aircraft stationary, performs a check known as "full power runup" by accelerating and maintaining full power. During this check which lasts some 32 seconds, the tail of the aircraft and consequently the blast from the engines is directed at the properties in Groups C, D and E. The blast fence does mitigate the effect of the blast on Groups C and D, but is not positioned to aid Group E.

The Commissioner described the effects as follows:

" * * * During this period of time the noise is terrific and "indescribable"; the houses shake and the windows rattle; flames and fumes are emitted from the engines; disturbing fumes and odors flow onto the properties and into the houses, especially when the wind is from the south or southeast; vibrations cause ripe citrus fruit to fall from trees growing on the properties; television reception is very poor, and it is nearly impossible to carry on conversations either in person or on the telephone; when night takeoffs are underway (which are sometimes performed at intervals of about three minutes), the residents on these properties are unable to sleep;

on several occasions, clouds of dust have been thrown into the area restricting visibility sufficiently that drivers of automobiles on nearby streets must slow down to avoid possible collision." (Finding 16)

From the facts, plaintiffs argue that these properties (Groups C, D and E) were subject to a physical invasion, the projection of vibration produced by sound waves.

In the Causby case, supra, the Supreme Court there stated:

"The path of glide to this runway *passes directly over the property* * * *. [T]he use of the airspace *immediately above the land* would limit the utility of the land and cause a diminution in its value." [Emphasis supplied]

The Court distinguished Richards v. Washington Terminal Co., supra, as a case of incidental damages arising from a legalized nuisance:

"In that case property owners whose lands adjoined a railroad line were denied recovery for damages resulting from the noise, vibrations, smoke and the like, incidental to the operations of the trains. In the supposed case the line of flight is *over the land.* And the land is appropriated as directly and completely as if it were used for the runways themselves. [328 U.S. at 262, 66 S.Ct. at 1066, 90 L.Ed. 1206, emphasis supplied]"

■ While plaintiffs may be correct in pointing out that the damages to these adjoining properties are every bit as great as the damages experienced by the parcels which are subject to an avigation easement, our jurisdiction does not extend to claims for damages from "legalized nuisance" or trespass sounding in tort. 28 U.S.C. § 1491.

Plaintiffs point to Cotton Land Co. v. United States, 75 F.Supp. 232, 109 Ct.Cl. 816 (1948), which involved the eventual flooding of plaintiff's land through erection of a dam. Since the flooding did not occur directly from erec-

tion of the dam, but rather through a chain of events occurring in a natural order, but originally set in motion by the erection of the dam, the Government defended on the theory that erection of the dam was too remote a cause on which to base liability. The Court concluded that there had been a fifth amendment taking. We rejected the "remoteness of cause" defense by pointing out that the flooding of the land was foreseeable. We looked to the law of torts on the remoteness issue, and found no intervening cause breaking the chain of causation. The Court concluded that the flooding was the "actual and natural consequence of the Government's act." But in that case, it must be remembered that there was an actual invasion of the surface of plaintiff's land, and that plaintiff's land was made subject to an actual servitude.

 No case supports plaintiffs' position here advanced that physical invasion of sound and shock waves constitutes an actual physical taking rather than merely nuisance or trespass. As an expression of existing law, we must concur with the analysis of the majority in Batten v. United States, 306 F.2d 580 (C.A.10, 1962), cert. denied 371 U.S. 956, 83 S.Ct. 506, 9 L.Ed.2d 502.

> "The vibrations which cause the windows and dishes to rattle, the smoke which blows into the homes during the summer months when the wind is from the east, and the noise which interrupts ordinary home activities do interfere with the use and enjoyment by the plaintiffs of their properties. Such interference is not a taking. The damages are no more than a consequence of the operations of the Base and as said in United States v. Willow River Power Co., supra, they 'may be compensated by legislative authority, not by force of the Constitution alone.' As we see the case at bar, the distinctions which the Supreme Court has consistently made between 'damages' and 'taking' control and compel denial of recovery." (306 F.2d at 585)

Consequently, we are forced to conclude as a matter of law that there has been no compensable taking of Groups C, D and E, and the petition as it relates to those parcels must be dismissed.

We do not accept the able dissent in Batten, supra, as urged by plaintiffs, and the question raised therein as to the point at which interference rises to the dignity of a "taking:"

> " * * * Is it when the window glass rattles, or when it falls out; when the smoke suffocates the inhabitants, or merely makes them cough; when the noise makes family conversation difficult, or when it stifles it entirely? In other words, does the 'taking' occur when the property interest is totally destroyed, or when it is substantially diminished?" (306 F.2d at 587)

We need not answer this hypothetical question, with its alarming implications. Although the Commissioner has found a substantial diminution in the property value of the parcels located in Groups C, D and E, this damage to plaintiffs has been merely consequential to the flights. There has been no actual invasion of the airspace over these plaintiffs' properties, nor has there been any total destruction of plaintiffs' property entered therein.

> " * * * [I]t is the character of the invasion, not the amount of damage resulting from it, so long as the damage is substantial, that determines the question whether it is a taking." United States v. Cress, 243 U.S. 316, 328, 37 S.Ct. 380, 385, 61 L.Ed. 746 (1917), cited in United States v. Causby, supra, 328 U.S. at 266, 66 S.Ct. at 1068, 90 L.Ed. 1206.

Accordingly, and upon the Commissioner's findings of fact, which are adopted as the findings of the court, we conclude that the owners of parcels 1 through 12, and 14 through 18, which make up Group A, as well as the owner of parcel 32, are entitled to recover for the avigation easement actually taken over those properties in January 1957.

Judgment will be entered as to these plaintiffs as their interests appear, and according to the schedule of damages set forth in findings 19 and 20. Defendant is vested with a further perpetual easement of flight for aircraft operated over the parcels in Group A, and parcel 32 in Group B. With respect to the remaining parcels, the petition is dismissed.