**Arlene A. NEHER, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 3–64–Civil 149.**

United States District Court
D. Minnesota,
Third Division.

Jan. 13, 1967.

Johnson, Essling & Malone, St. Paul, Minn., for plaintiff.

At the trial William W. Essling and Charles H. Williams, Jr., St. Paul, Minn., appeared for plaintiff.

Patrick J. Foley, U. S. Atty., Minneapolis, Minn., for defendant.

At the trial J. Charles Kruse, Washington, D. C., and Lt. Col. Fielding Washington appeared for defendant.

## MEMORANDUM DECISION

LARSON, District Judge.

This is an action under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), §§ 2671–2680, and the Tucker Act, 28 U.S.C. § 1346(a), in which plaintiff seeks recovery from defendant United States for alleged damage to property caused by sonic booms generated by Air Force B–58 planes. The case was tried to the Court without a jury on August 11 and August 12, 1966. William W. Essling, St. Paul, and Charles H. Williams, Jr., appeared for plaintiff. J. Charles Kruse of the Department of Justice, Civil Division, and Lieutenant Colonel Fielding Washington of the Office of Judge Advocate General, Air Force, appeared for defendant.

## FACTS

Plaintiff Arlene Neher is the owner of a four story apartment building in St. Paul, Minnesota, located at 61 South St. Albans, a neighborhood composed primarily of apartment buildings. The Neher building is approximately sixty-five years old, constructed of brick and stone facing. There are eight apartments in the building, two on each floor. The interior walls are plaster on top of wood lathing, and the floors and main stairway are oak wood.

In September, 1960, plaintiff Arlene Neher moved into Apartment F of this building. Prior thereto the apartment was completely redecorated, including patching and filling plaster cracks, painting, and wall papering in some rooms of the apartment. Two other apartments —D and G—were also redecorated, sometime from November, 1960, to January, 1961, including repair of plaster cracks. Plaintiff inspected Apartment H, but no replastering was done. No structural repairs were made to the building but plaintiff did replace all broken and cracked windows at the time she took up residence in the building.

From April 5, 1962, through August 6, 1962, B–58 Air Force planes operating out of the United States Air Force Base at Bunker Hill, Indiana, made forty-one supersonic flights over the Minneapolis-St. Paul area. A supersonic flight is one in which the aircraft travels at speeds in excess of the speed of sound. Mach I designates the speed of sound, which varies depending upon factors such as altitude. At 40,000 feet it is approximately 600 miles per hour. Most of the flights in question were at Mach II, or twice the speed of sound. In general, that would be 1,200 miles per hour. Altitudes of the flights in question, as recorded in Exhibit D—the Sonic Boom Log from Bunker Hill—ranged from 30,000 to 50,000 feet.

The supersonic flights over the Minneapolis-St. Paul area generated sonic booms. These are the shocks, pressures and noises caused by the dispersion of air when a plane travels at supersonic speeds. Since air travels only at the speed of sound, it cannot move quickly enough to avoid the path of a plane traveling in excess of the speed of sound. Thus the air piles up in a "shock front" preceding a plane traveling at supersonic speeds and is then dispersed, traveling continuously behind the plane while it is proceeding supersonically. The strength of a sonic boom varies, depending upon such factors as design of the aircraft, its speed and altitude, among other factors. Computation of a boom's strength can be accomplished by applying the Free Field Equation (Exhibit H, p. 23), and is expressed in terms of pounds per square foot (p. s. f.).

In 1962 Bunker Hill Air Force Base was training crews to become combat ready with the B–58 plane. The training included flying missions during which supersonic runs were made, lasting from five to eight minutes. During the supersonic run a simulated bomb release was performed in which a ground radio site determined whether the theo-

retical target had been hit. Supersonic training missions from Bunker Hill were conducted to meet the requirements in the Strategic Air Command Training Manual for supersonic missions and supersonic simulated bomb releases. The manuals are issued from Strategic Air Command Headquarters and the missions are planned on the base level to accomplish the items outlined in the manual. Colonel Frank Scurlock, Director of the Programs and Scheduling Branch of the 305th Bomb Wing at Bunker Hill in 1962, testified that all the supersonic flights in question were routine missions with the supersonic activity confined to a designated corridor, the aircraft flying straight and level.

A supersonic corridor is a theoretical avenue in the air, normally twenty nautical miles wide and from 300 to 600 nautical miles long. Such corridors are adopted by the Strategic Air Command in conjunction with the United States Air Force. Colonel Scurlock testified that the corridors could be laid out almost anywhere, including over the ocean or other unpopulated areas. During the spring and summer of 1962 one such corridor was located over the Twin City area, known as the Minneapolis corridor (Exhibit B). It began in Minot, North Dakota, and terminated just beyond Minneapolis, with an extension that continued into the Milwaukee corridor (Exhibit C). Plaintiff's building is located from eight to ten miles west of the center line of the Minneapolis corridor.

On several days during the summer of 1962 (June 5 and 6; July 6, 12, 13, 16, 25 and 26), plaintiff specifically noted the occurrence of sonic booms over the property, marking the dates on a calendar (Exhibit 5). During this period tenants in the building, including plaintiff, noticed the appearance of plaster cracks and broken windows. Subsequently plaintiff became aware of squeakiness in the floors and stairway that had not existed prior to the booms. One tenant testified to noticing squeaky floors immediately after the booms, while another tenant did not recall squeakiness until

October, 1965. According to plaintiff, the squeakiness became more apparent in the winter of 1962–1963. In addition to the squeaky floors, plaintiff attributes other structural damage to the sonic booms, including cracked oak pillars, settling of floor boards under radiators, sagging doors, and a damaged drainpipe.

Various test programs have been conducted by agencies of the United States to study the sonic boom phenomena. Witness Dr. Wiggins was Technical Director of the White Sands Program (Exhibits I and J) and was also responsible for analyzing data from a program at Oklahoma City (Exhibits F, G, H and K). Dr. Wiggins testified that the White Sands Project established that (1) structures work elastically under sonic boom pressure, returning to their original shape after the pressure subsides, rather than having any type of permanent set; (2) that the threshold level of pressure for plaster cracks and glass breakage was ten pounds per square foot, except that predamaged glass might crack at six or seven pounds per square foot. Calculating the pressure of the sonic booms over plaintiff's property on the basis of the Free Field Equation (Exhibit H, p. 23), Dr. Wiggins reached a maximum of 1.8 p. s. f. and a minimum of 1.56 p. s. f. On the basis of the calculated overpressure and the test experience at Oklahoma City where the average boom was 1.5 p. s. f., Dr. Wiggins concluded that the sonic booms could not have caused any damage to plaintiff's property.

Sonic boom intensities vary over a wide range in a random pattern (Exhibit J, pp. 123, 176). Measurements of overpressure at lateral distances of five or more miles from the center of a supersonic track have a wider range of variation than directly on the track (Exhibit K, p. 1). According to the Oklahoma report (Exhibit F, p. 221), "current prediction methods tend to overestimate overpressure values occurring at 5 and 10 miles away from the flight path." Wind and other atmospheric conditions also have a marked effect on overpressure (Exhibit J, pp. 173, 176). The

White Sands and Oklahoma City tests determined the effect of wind, temperature, pressure and lateral spread only within broad limits (Exhibit H, p. 13).

Test House Number 5 in the Oklahoma project was over fifty years old (Exhibit F, p. 17). The average overpressure in Oklahoma City was 1.5 p. s. f. (Transcript, p. 131). It was concluded that low relative humidity had a relationship to paint and plaster cracking, but that sonic booms accelerated the occurrence of paint cracking over nail heads and at corners (Exhibit F, pp. 220, 222). Damage to plaster surfaces was considered negligible. In general, windows were not damaged, but sonic booms such as those generated at Oklahoma City "constitute potential hazard to an indeterminate number of sub-standard or improperly installed glass installations." (Exhibit F, p. 221). No significant damage was caused to structural framing, floor slabs or floors. The Oklahoma report (Exhibit F, p. 219) expressly limits the conclusions to that area, stating that "Projection of these findings to different types of structures or to different geographical areas, or to other types of sonic boom shock waves should not be undertaken without exercising considerable care and caution."

In St. Louis, Missouri, ten supersonic test flights were conducted by B–58 aircraft at altitudes of 31,000, 35,000 and 41,000 feet and Mach speeds of 1.5 and 2.0. (Exhibit G, p. II–1). Overpressures generated were under 3 p. s. f. The report of that test concludes that sonic booms can trigger structural failures (Exhibit G, p. IV–1) the same as other types of phenomena such as a thunderstorm. Dr. Wiggins agreed with this (Transcript, p. 217). With respect to plaster, the St. Louis report indicated that overpressures were not great enough to cause damage to sound areas, but

"It is conceded that the experienced overpressures have the capability of triggering cracking or complete failure at a stressed portion of plaster and/or causing an existing crack to become more extensive * * *. Plaster cracking was found in some cases where no contributing factors were judged to exist and thus the damage was considered to be valid or possibly valid."

The results with respect to glass damage were similar in that good quality, properly installed glass did not break. But the report indicates that:

"It is conceded that overpressures have the capability of triggering cracking or breaking of glass that was stressed by improper stallation, building settlement, previous damage or poor quality."

The Missouri report also indicates that preboom conditions such as drying out of lumber has an effect on structural damage. Witness Carswell expressed the opinion that squeakiness in the stairs at plaintiff's property was due to changes in temperature and humidity, plus normal traffic over a period of years. Squeakiness of the floors was attributed to shrinkage of the wood as heat and dryness take the moisture out, resulting in more noticeable squeaks during the winter months than during the summer.

## DISCRETIONARY FUNCTION

28 U.S.C. § 2680(a) denies coverage under the Federal Tort Claims Act for claims:

" * * * based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

See Annot., 99 A.L.R.2d 1016. Huslander v. United States, 234 F.Supp. 1004 (W.D.N.Y.1964), and Schwartz v. United States, 38 F.R.D. 164 (D.N.D.1965), applied the exemption to bar recovery for sonic boom damage claims, holding that the authorization of supersonic flights was a discretionary function. Defendant United States urges application of the exemption here.

Prior to trial a stipulation was entered into between plaintiff's counsel and the

United States Attorney striking from the answer the First, Second and Fourth Defenses. They alleged, respectively, that the complaint failed to state a claim for relief; that the Court lacked jurisdiction because no claim was stated for which the United States, if a private person, would be liable; and that the Court lacked jurisdiction because the claim fell within the exception stated in 28 U.S.C. § 2680(a).

Trial counsel for the United States was unaware of the stipulation but urges that it was not intended to waive the discretionary function exemption and, further, that Government counsel has no authority to do so because the exception is jurisdictional.

■ The stipulation here was agreed upon in response to plaintiff's motion seeking to strike certain defenses. In a companion case, Kelly v. United States, No. 4–64–Civ. 154, the same counsel made a similar motion which was argued before Judge Nordbye. The transcript of that hearing indicates a question from the the Court asking the United States Attorney his position "as to the lack of jurisdiction under the Federal Tort Claims Act," to which the response was, "We concede the Court has jurisdiction under the Federal Tort Claims Act." (Transcript, p. 17). Thereafter an Order was signed by Judge Nordbye striking from the answer the First, Second and Fourth Defenses, which are identical to those in the present case. The hearing in the *Kelly* case is ambiguous and gives no clear indication that the United States Attorney intended to waive the discretionary function exemption. He made no specific reference to it. Nonetheless the stipulation in this case was apparently entered into with full knowledge that it struck the only reference in the answer to the discretionary function exemption. No mistake or misunderstanding has been shown, and I find that the exemption was waived by the stipulation.

Trial counsel for the United States moved to reinstate the exemption, con-

tending that exceptions to the Act are jurisdictional and cannot be waived. Decision was reserved until after the trial. I now conclude that the exemption can be waived.

■■ Several cases have referred to the discretionary function exception as jurisdictional. See, e. g., Swanson v. United States, 229 F.Supp. 217, 219 (D. Cal.1964); Sisley v. United States, 202 F.Supp. 273, 274 (D. Alaska 1962). However, this Court subscribes to the reasoning of Stewart v. United States, 199 F.2d 517 (7th Cir. 1952), in which it was held that the exception was available to the Government only as a defense, properly pleaded and proven. In that case the United States answered on the merits to a claim alleging failure to keep military explosives properly stored out of the public's reach. The Government raised the discretionary function exemption for the first time after summary judgment in its favor had been reversed by the Seventh Circuit and the case remanded solely for determination of damages. Refusing to allow assertion of the defense, the Court stated:

> "In our view, Sec. 1346(b) conferred general jurisdiction of the subject matter of claims coming within its purview, and the exceptions referred to are available to the government as a defense only when aptly pleaded and proven. If this view be correct, we discern no reason why the government the same as any other party-defendant should not be held to have waived the defense." 199 F.2d at 519.

The Court noted that if the exception were jurisdictional it would be incumbent upon the plaintiff, the party carrying the burden of demonstrating the Court's power to hear and decide, to negative all the exceptions of the Act. Based on the *Stewart* decision, with which this Court is in accord, defendant's motion to reinstate the discretionary function exemption is hereby denied.

## STATUTE OF LIMITATIONS

■ At the commencement of the trial plaintiff moved to amend the complaint to include allegations referring to supersonic flights and sonic booms during the year 1961. Decision on the motion was reserved. The Court agrees with the contention of the United States that the two year limitation on tort claims, 28 U.S.C. § 2401(b), bars such amendment. Plaintiff takes the position that the sonic booms were continuing torts, so that the statute would not begin to run until the last flight. The Court finds this argument unpersuasive. If an automobile ran the same red light on different days and collided with plaintiff every time, each event would be a separate act of negligence. The same rule must apply to the flights here. The complaint was filed on May 15, 1964, more than two years after the alleged flights in 1961. Insofar as plaintiff's claim with respect to these flights is based on negligence, the complaint is untimely and, therefore, the motion to amend must be, and is hereby, denied.

## TUCKER ACT

■ In addition to seeking recovery under the Tort Claims Act, plaintiff's claim is also based on the Tucker Act. The claim is that the sonic booms constituted a taking of property for public use, compensable under the Fifth Amendment. 28 U.S.C. § 2401(a) establishes a six year limitation on civil actions against the United States, and this period applies to Tucker Act claims. Erceg v. United States, 179 F.2d 510, 511 n. 2, 12 Alaska 569 (9th Cir. 1950). Since the Court concludes there is no basis for recovery under the "taking" theory, amendment of the complaint to refer to 1961 flights is unnecessary.

■ United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), held that frequent low flights of military aircraft over plaintiff's chicken farm, rendering the property unusable for that purpose, was a compensable taking. The flights there were about eighty-three feet high and the Court noted in particular that the aircraft was not within the navigable airspace which Congress placed in the public domain. Presently navigable airspace begins above the minimum altitudes of flight prescribed by regulation. 49 U.S.C. § 1301(24). The highest minimum altitude is 1,000 feet. 14 C. F.R. § 60.17(b). Thus aircraft flying above 1,000 feet would be traveling in the navigable airspace which is part of the public domain. The lowest altitude of the supersonic flights in this case was 30,000 feet, securely within the public domain navigable airspace.

■ This does not end the matter, however, because plaintiff's complaint is not that the aircraft invaded her property, but that they generated noises, shocks and vibrations which did descend upon the building. Without a physical invasion by low and frequent flights directly and immediately interfering with the use and enjoyment of the land, these annoyances are not compensable under the Fifth Amendment. Directly in point are Batten v. United States, 306 F.2d 580 (10th Cir. 1962), cert. denied, 371 U.S. 955, 83 S.Ct. 506, 9 L.Ed.2d 502, and Leavell v. United States, 234 F. Supp. 734 (D.S.C.1964). Plaintiffs in both cases sought Fifth Amendment compensation for noise, vibration and smoke caused by military jets on nearby bases. In neither case was there physical invasion by over-flights, and both decisions denied recovery. See also, Schubert v. United States, 246 F.Supp. 170 (S.D. Tex.1965). In *Batten* the Court indicated that the interferences with plaintiffs' property was consequential damages, and not a taking. Further, the Court said, "Sound waves, shock waves, and smoke pervade property neighboring that on which they have their source but the disturbance caused thereby is only a neighborhood inconvenience * * *." 306 F.2d at 585.

Bennett v. United States, 266 F.Supp. 627 (W.D.Okl., Aug. 20, 1965), also rejects the notion that sonic boom damage gives rise to a Fifth Amendment taking claim. This Court is of the same opinion.

## NEGLIGENCE

█ Under the Tort Claims Act plaintiff must show negligence in order to recover against the United States. Of the five decisions involving sonic boom claims none has given plenary consideration to the issue of negligence since other grounds were present to dispose of the case. Huslander v. United States and Schwartz v. United States, supra, applied the discretionary function exemption. Brown v. United States, 230 F.Supp. 774, 775 (D.Mass.1964); Dabney v. United States, 249 F.Supp. 599 (D.N.C.1965), and Tabb v. United States, 267 F.Supp. 187 (M.D.Ga. August 11, 1965), all found a lack of causal connection between sonic booms and the claimed damage, assuming the existence of negligence. In *Brown* the Court did find a lack of proof as to the standard of care for pilots of supersonic flights and as to the negligence of the pilots.

In the present case the evidence indicates that all the flights were routine training missions, the aircraft being flown straight and level above 30,000 feet, with supersonic activity confined to the supersonic track. As such, they complied with Air Force Regulation 55-34, July 27, 1960 (Exhibit E). It provides that "sonic and supersonic speeds during straight and level flight will be commenced and terminated at altitudes above 30,000 feet over land areas and above 10,000 feet over water areas." The regulation also forbids intentional performance of sonic booms except—

" * * * (2) during phases of formal training courses which require sonic or supersonic speeds or the performance of sonic booms; when these flights are required, they must be conducted over specially designated areas under close supervision * * *."

There is thus no record evidence that the flights were negligently performed.

█ However, the testimony does indicate that it would be possible for supersonic corridors to be designated over uninhabited or sparsely populated areas, or over bodies of water. The radar equipment necessary to track the simulated bomb releases during supersonic training flights could be located anywhere as it is readily movable. The record shows no compelling necessity to plot supersonic corridors over or near permanent bases or populated areas. Thus, I conclude the United States was negligent in designating and using a supersonic corridor over the Minneapolis-St. Paul area during 1962.

## CAUSATION

█ The expert testimony was that sonic booms did not cause squeaky floors and stairways in plaintiff's property. The Court finds that the opinion is supported by other evidence and concludes that the booms were not the proximate cause of the structural damage claimed by plaintiff. The squeakiness did not occur immediately after the booms as it would have had the booms been the cause. Since sonic booms do not cause permanent set, any squeakiness attributable to the booms would have occurred immediately. Plaintiff's own testimony indicates that squeakiness was more noticeable in the winter months when heat from the radiators caused dryness. In view of the building's age, squeakiness of wood floors and stairways can be expected from the normal cycle of expansion and contraction due to temperature changes and repeated traffic over the years.

The Court is, however, unable to accept the expert opinion that the booms did not cause plaster damage and glass breakage. The overpressures calculated by Dr. Wiggins were on the basis of an equation (Exhibit H, p. 23), several aspects of which were unavailable, such as wind and atmospheric conditions, which admittedly have an influence on the strength of the booms. In addition, random variations are found in boom strength, especially in areas lateral to the flight path. Plaintiff's property was eight to ten miles west of the center line of the corridor. According to the reports, current methods of calculating boom strength tend to underestimate

overpressures in lateral areas. As a collateral note, it is interesting that the Court in the *Tabb* case, supra, found that a B–58 flying at maximum speed (which the testimony in the instant case indicates is Mach 2) at 35,000 feet would generate booms of 5 to 7 p. s. f. Using the same factors (B–58 design, speed, and altitude), with substantially equivalent numerical components, the pressure arrived at in this case was considerably less.

While the test reports generally conclude that sonic booms of low strength do not cause damage, there is a recognition that they do constitute a hazard to substandard structures. Although plaster cracks were repaired and broken glass replaced prior to the booms, in this case we are dealing with a building of considerable age.

Perhaps the most compelling influence on this Court's rejection of the expert opinion regarding plaster and glass damage is the apparent distinction between cause and effect as viewed by scientists and legal causation. Although Dr. Wiggins and the various test reports acknowledge the triggering and accelerating effect of sonic booms, from a scientific standpoint these do not seem to be considered a cause. For example, in discussing a window broken by a boom of very great strength, Exhibit J, p. 117, states that the window did not break because of excessive pressure per se, "but because the window, which was opened at the time, was slammed by the boom and the slamming broke the window." Throughout the reports (Exhibits F–K), this type of approach to cause and effect is apparent. But this type of cause is not the same as proximate cause, which is the efficient cause, or the one which necessarily sets in operation the factors which accomplish the damage. Applying this test, I conclude that the sonic booms did cause plaster and glass damage to plaintiff's building.

## DAMAGES

Plaintiff testified to a $10,000 difference in the value of the property before and after the sonic booms. However, this took into account the squeaky floors and stairway. The only damage includable in determining the difference in value is the plaster damage and glass breakage. Plaintiff has limited her claim for plaster damage to three apartments redecorated prior to the booms (D, F, and G) and one apartment (H) which was not redone. Plaintiff acknowledged that there were cracks in Apartment H prior to the booms (Transcript, p. 77). Since there was no evidence segregating these preboom cracks, Apartment H cannot be included. Considering the repair estimates (Exhibits 1, 2, 3, and 7), I find that the plaintiff's property has been damaged in the amount of $750.00.

The foregoing shall constitute findings of fact and conclusions of law as required by Rule 52, F.R.Civ.P.

## ORDER FOR JUDGMENT

Judgment will be entered in favor of plaintiff and against defendant in the amount of $750.00.